**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re RCI Hospitality Holdings, Inc.<br><br>Securities Litigation | Master File No.: 4:19-cv-01841-AHB<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>This Document Pertains To: All Actions |

Lead Plaintiffs Roger DeMaggio, Patrick Prahl, Justin Kinslow, Joseph Milo and Edgar M. Kee ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, Lead Counsel's investigation, which includes without limitation: (i) review and analysis of regulatory filings made by RCI Hospitality Holdings, Inc. ("RCI" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) review and analysis of analyst and media reports; (iii) review and analysis of press releases and other public statements issued and disseminated by RCI or its authorized agents, including the Individual Defendants; (iv) review of other publicly available information concerning RCI; (v) review of public court dockets of various lawsuits filed by or against RCI and (vi) interviews with former employees of the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      Plaintiffs bring this class action on behalf of persons and entities that purchased or otherwise acquired RCI securities between December 13, 2016 and July 18, 2019, inclusive (the "Class Period"), and who were damaged thereby.  Plaintiffs seek to pursue remedies against Defendants[1] under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      RCI is a holding company that operates live adult entertainment and bar and restaurant establishments through its subsidiaries.  The Company has two principal reportable segments: an adult entertainment line of businesses ("Nightclubs") and a bar/restaurant line of

---

[1] Defendants are: RCI and the Individual Defendants, CEO Eric Langan ("Langan"), CFO Phillip Marshall ("Marshall"), and outside Directors Nour-Dean Anakar ("Nour-Dean Anakar") and Steven L. Jenkins ("Jenkins").

business ("Bombshells").  In fiscal year 2016, RCI reported $113.9 million in revenues from

Nightclubs, $18.7 million from Bombshells restaurants, and $2.23 million reported as "other."[2]

For fiscal years 2016-2018, RCI reported approximately $20.5 million, $19.3 million, and $23.2

million in free cash flow,[3] and $11.3 million, $9.9 million, and $17.7 million in cash and cash

equivalents, respectively.

3.      Throughout the Class Period, Defendants made numerous materially false and/or

misleading statements and omissions to investors regarding, among other things, material

weaknesses in the Company's internal controls, executive compensation, and related party

transactions.

4.      Investors and the market generally monitor the quality of a company's internal

controls because strong controls reassure investors that a company's financial data is accurate.

Weak internal controls, on the other hand, make a company vulnerable to instances of inaccurate

financial reporting or malfeasance, causing the company's public statements regarding the

company's operations, financial performance, and prospects to be less reliable.

5.      The Class Period starts on December 13, 2016, when Defendants filed the

Company's fiscal year 2016 Form 10-K (the "FY 2016 Form 10-K"), assuring investors that as

of September 30, 2016, "***our internal control over financial reporting was effective***."[4]  The

Company's FY 2016 Form 10-K also stated, "[w]e know of ***no related transactions for the years***

***ended September 30, 2016*** and 2015."

6.      Despite Defendants' assurances to investors, the FY 2016 Form 10-K materially

---

[2] For FYs 2017 and 2018, RCI reported, $124.7 million and $140.1 million in revenue from
Nightclubs, $18.8 million and $24.1 million from Bombshells restaurants, and $1.4 million and
$1.6 million reported as "other," respectively.

[3] Free cash flow is derived from net cash provided by operating activities less maintenance
capital expenditures.

[4] The Company's fiscal year runs from October 1 through September 30.

misrepresented the state of RCI's internal controls, materially understated, *inter alia*, executive compensation, and failed to disclose numerous material related party transactions—most of which directly benefitted Defendant Langan, members of the RCI Board of Directors, and/or members of their immediate families.  As detailed herein, Defendants touted RCI as a reliably audited publicly-traded Company, but in fact were using the Company not only to make friends and family rich, but also for their own personal enrichment and enjoyment throughout the Class Period.

7.     RCI's FY 2016 Form 10-K failed to make numerous required disclosures, and misrepresented the effectiveness of RCI's internal controls in a number of ways.  For example, the FY 2016 Form 10-K failed to disclose executive compensation to Defendant Langan and RCI's Executive V.P. and member of its board of directors Travis Reese ("Reese") derived from their personal use of Company-owned aircrafts, in violation of Item 402 of Regulation S-K.[5] The FY 2016 Form 10-K also violated, among other things, Generally Accepted Accounting Principles ("GAAP"), Item 404 of Regulation S-K,[6] and NASDAQ rule 5630[7] because it failed to disclose at least two material related party transactions: (1) it did not disclose Ed Anakar's generous salary of $375,000, which is a related party transaction due to the fact that Ed Anakar is the brother of Defendant Nour-Dean Anakar, a supposed independent director on RCI's board and a member of both the audit and compensation committees and; (2) it did not disclose that

---

[5] Item 402 of Regulation S-K required Defendants to provide, in RCI's financial statements filed with the SEC during the Class Period, clear, concise and understandable disclosure of all plan and non-plan compensation awarded to, earned by, or paid to the named executive officers and directors.  17 C.F.R. § 229.402 ("Item 402").

[6] Item 404 of Regulation S-K required Defendants to describe, in RCI's financial statements filed with the SEC during the Class Period, "any transaction, since the beginning of the registrant's last fiscal year, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."  17 C.F.R. § 229.404(a) ("Item 404").

[7] NASDAQ rule 5630 governs the disclosure of related party transactions and created an independent duty to disclose certain transactions pursuant to Item 404.

RCI paid Creative Steel, a company owned by Defendant Langan's father, $176,864 for goods and services provided in fiscal year 2016.  The FY 2016 Form 10-K also failed to disclose that RCI hired Tannos Construction, a company with which Defendant Langan was closely affiliated both personally and professionally, to construct RCI's new corporate headquarters—a project which RCI took out a $4.7 million construction loan to complete.  Moreover, in violation of Item 401 of Regulation S-K,[8] the FY 2016 Form 10-K did not disclose that Steven Jenkins, a member of RCI's board of directors, filed voluntary petitions for bankruptcy in August 2010 and again in October 2015.

8.      Following the filing of RCI's FY 2016 Form 10-K, Defendants repeatedly attested to the Company's legitimacy as a publicly traded company in the adult entertainment industry.  To engender investor confidence, Defendants specifically touted the supposed reliability of the Company's accounting because, as a publicly-traded company, RCI was subject to auditing and public financial reporting.  Defendants further represented RCI to investors as a company that could be trusted in the adult nightclub industry, particularly because of its status as an audited publicly-traded company, and the only attractive buyer to the individual owners throughout the country that are aging out of the industry.

9.      For example, on March 29, 2017, RCI participated in the Sidoti & Company Spring 2017 Emerging Growth Convention during which Defendant Langan publicly touted the Company's "significant business advantages compared to [RCI's] competitors" and that "being publicly traded, has b[r]ought about other critical advantages."  Defendant Langan stated, "[t]here's no buyers.  We're it.  There is no one – unless you're going to owner finance…[a]nd if you're going to owner finance, would you rather have someone with a publicly traded, audited

---

[8] Item 401 of Regulation S-K requires disclosure of bankruptcy petitions that occurred during the past ten years and that are material to an evaluation of the ability or integrity of any director.  17 C.F.R. § 229.401 ("Item 401").

financial background and 22 years of history of paying every loan and every debt[.]"

10.     During that same presentation, Langan assured investors that RCI "developed sophisticated systems for management, cash handling, purchasing and other best practices." Langan also touted the Company's implementation of "a disciplined capital allocation strategy" as an advantageous method for managing the large amount of cash held by the Company.

11.     During the third quarter 2017 earnings call held on August 9, 2017, Defendants again assured investors that RCI had the market cornered on acquiring only the best of the best in adult entertainment nightclubs based on RCI's elevated status as a publicly traded company. When discussing the Nightclubs business segment, Langan stated "[m]any owners are of an age where they're interested in selling.  As the only publicly traded company in the industry and the only entity with significant access to bank financing, we are the acquirer of choice."

12.     The Company first partially informed investors of material weaknesses related to RCI's "internal control over financial reporting" in the Company's Form 10-K for fiscal year 2017 that it filed with the SEC on February 14, 2018 (the "FY 2017 Form 10-K").  The FY 2017 Form 10-K disclosed the existence of the material weaknesses, and stated that the material weaknesses arose from "not design[ing] or maintain[ing] an effective control environment." According to the FY 2017 Form 10-K, the lax control environment contributed to ineffective controls in three specific areas: (1) ineffective controls over complex accounting and management estimates; (2) ineffective controls to support accurate accounting, reporting, and disclosures in the FY 2017 Form 10-K; and (3) ineffective controls to prevent unauthorized access to certain systems, programs and data.  Defendants primarily attributed these material weaknesses to not having "a sufficient complement of accounting and financial reporting personnel with an appropriate level of knowledge to address our financial reporting requirements."

13.     Despite these partial disclosures, however, Defendants simultaneously (and misleadingly) assured investors that they were effectively remediating RCI's control deficiencies.  For example, in order to strengthen internal controls over financial reporting, RCI stated that it would hire an independent internal audit group to assist with controls over certain processes and other internal control functions, it upgraded RCI's accounting staff with certain newly hired accountants, and added an overlay of review of RCI's financial statements during its financial reporting process.  Additionally, in order to strengthen internal controls over complex accounting and management estimates, RCI stated that it hired valuation experts to assist with impairment analyses when necessary and with the analysis and accounting for business combinations, income taxes, and other complex accounting matters.

14.     Defendants continued to disclose the existence of the same three areas of material weaknesses related to its financial reporting in its fiscal year 2018 quarterly reports filed on March 7, 2018, May 10, 2018, and August 9, 2018.  Despite the ongoing nature of these material weaknesses, however, Defendants again repeatedly (and misleadingly) assured investors that they were meaningfully addressing and effectively remedying the weaknesses.

15.     Moreover, despite the partial disclosure of certain material weaknesses over internal controls and financial reporting,  RCI's FY 2017 Form 10-K and FY 2018 Form 10-Qs failed to disclose other material weaknesses in internal controls.  Additionally, the FY 2017 Form 10-K continued to conceal certain material related party transactions and failed to make other required financial disclosures.  First, the FY 2017 Form 10-K again did not disclose personal use of the Company-owned aircraft by Defendant Langan and Reese and therefore misstated and under-reported their executive compensation.  Second, the FY 2017 Form 10-K again did not disclose Ed Anakar's salary, which by 2017 had increased to $450,000.  Third, the FY 2017 Form 10-K did not disclose that in FY 2017 RCI paid a total of $135,322 to Sherwood

Forest (owned by Langan's brother) and Creative Steel (owned by Langan's father) for goods and services rendered by those related companies in FY 2017.  The FY 2017 Form 10-K also failed to disclose that RCI hired Tannos Construction, a related party as alleged herein, to construct at least one Nightclubs location and one Bombshells location in 2017—projects that clearly cost in excess of the $120,000 minimum disclosure requirement for related party transactions in FY 2017.  *See* Exhibit A hereto.  Finally, the FY 2017 Form 10-K again did not disclose Director Defendant Steven Jenkins's August 2010 and October 2015 bankruptcies.

16.     On December 31, 2018, after the market closed, Defendants filed RCI's Form 10-K for fiscal year 2018 (the "FY 2018 Form 10-K"), which continued to report the existence of material weaknesses in internal controls over financial reporting as reported in the FY 2017 Form 10-K, as well as the following additional problem areas: (1) ineffective controls to ensure against comingling of cash between RCI's Nightclubs and Bombshells business lines and the review of journal entries used to record revenue transactions; and (2) ineffective controls to ensure the filing of quarterly financial reports in a timely manner.  The FY 2018 Form 10-K further stated that the material weaknesses were due to the Company's failure to have "a sufficient complement of accounting, financial and information technology personnel with an appropriate level of knowledge to assess internal control risks, address known internal control weaknesses, and address the Company's overall financial reporting and information technology requirement."  In the FY 2018 Form 10-K, RCI's outside auditor, BDO USA, LLP ("BDO"), also expressed its opinion that "RCI [] did not maintain, in all material respects, effective internal controls over financial reporting as of September 30, 2018."

17.     Despite these partial disclosures, however, Defendants again simultaneously (and misleadingly) assured investors that they were effectively remediating RCI's control deficiencies.  For example, in order to strengthen controls over filing quarterly financial reports

in a timely manner, RCI stated that it had: (1) retained a "more robust outside consulting firm" to assist in maintaining adequate internal controls; (2) upgraded the accounting staff with certain newly hired accountants; (3) developed controls to review financial statement balances or the related footnote disclosures and evaluate variances between monthly and quarterly financial statements.

18.     Despite these assurances, additional material weaknesses over internal controls remained and the Company's FY 2018 Form 10-K also again failed to disclose certain material related party transactions and failed to make other required financial disclosures.  First, the FY 2018 Form 10-K again under-reported executive compensation to Defendant Langan and Reese, which partially omitted compensation derived from their personal use of Company-owned aircrafts.  Second, the FY 2018 Form 10-K again failed to disclose Ed Anakar's salary, which had increased again, now up to $471,154 per year in 2018.  Third, the FY 2018 Form 10-K failed to disclose that RCI paid $321,353 to Sherwood Forest (owned by Langan's brother) for goods and services rendered by that related company in FY 2018.  The FY 2018 Form 10-K also failed to disclose that RCI hired Tannos Construction, a related party as alleged herein, to construct at least three Bombshells locations—projects that clearly cost in excess of the $120,000 minimum disclosure requirement for related party transactions in FY 2018.  *See* Exhibit A hereto.  And finally, the FY 2018 Form 10-K again failed to disclose that Defendant Steven Jenkins filed voluntary petitions for bankruptcy in August 2010 and October 2015.

19.     That same day, on New Year's Eve, Defendants held the FY 2018 fourth quarter and year-end earnings call (the "Q4 2018 Earnings Call"), which, according to Defendant Langan, was attended by "about half the number of callers we normally have on this call." Douglas Weiss of Sidoti & Company, LLC questioned CEO Langan about RCI's remediation of its internal control problems: "BDO had some comments in the last K, and you guys sort of

published what you're doing in the—from a remediation standpoint.  And then they seemed to have a similar comments in this K…are you working with them so that, … that those issues are resolved this year?"  Defendant Langan misleadingly assured the market that the Company had taken sufficient and effective steps to remediate the control deficiencies.  For example, Langan stated that Defendants had "hired a third party internal auditing company, a controls company to came in and helped us write a lot of controls.  We bought some additional what they call SOD, Segregation of Duties software, that was installed and put it in May….we've been working on this throughout the year in order to get a clean bill of health on these internal control requirements."

20.     Still, in an attempt to misleadingly diminish the seriousness of BDO's adverse opinion regarding deficiencies in RCI's internal controls, Defendant Langan pointed out that RCI received "an unqualified opinion" and that meant "the numbers all checked out."  Langan dismissively continued "[BDO] just ha[s] to do a lot of auditing to get to that comfort level they needed to do with the duty."

21.     During the same New Year's Eve 2018 earnings call, in response to direct analyst inquiry questioning Langan's involvement with Tannos Construction, Defendant Langan also misrepresented and misleadingly downplayed his involvement with Tannos and his substantial personal financial interest in the Tannos companies.  In addition to downplaying his roles in Tannos companies, Langan downplayed and failed to disclose RCI's substantial related party transactions with Tannos in 2018:

> DARREN MCCAMMON: Okay. In the past, there's been a question about your relationship with Tannos Construction. Can you outline that for us just real quick?
>
> ERIC SCOTT LANGAN: ***Tannos Construction is a contractor that does some contracting work for us***.  I've made investments in some of his projects personally, some shopping centers in Friendswood, Texas, where RCI has no business or no - we don't do anything in Friendswood, Texas basically.  It's a smaller bedroom community in Houston, and ***yes, I've made some investments,***

*but that's about the end of it.  Other than that, there's nothing to tell.*

22.     Langan, in fact, was deeply involved and personally financially interested in numerous Tannos companies and enjoyed palling around with Louis Tannos on the RCI corporate jet.

23.     Defendants continued to disclose the existence of the same five areas of material weaknesses related to its financial reporting in its fiscal year 2019 amended quarterly report filed on March 1, 2019 (the "Q1 2019 10-Q/A").  Despite the disclosure of the continued existence of material weaknesses, Defendants again continued to misleadingly reassure investors that they were effectively remedying the weaknesses.  For example, in addition to the remedial measures described above, Defendants claimed to be developing proper controls to: (1) evaluate variances in monthly and quarterly financial statements; and (2) review and evaluate financial statement balances and the related footnote disclosures.  Moreover, the Company stated it "would consider certain enhanced journal review procedures which will ensure that proper review can be executed and evidenced."

24.     The false and misleading nature of Defendants' assurances about RCI's operations and their failure to actually implement effective internal controls over financial reporting would soon catch up to Defendants and be revealed to investors.  On May 10, 2019, RCI announced that it could not timely file its quarterly report for the second quarter of FY 2019.  RCI explained that in response to the publication of a series of negative articles in mid-and late 2018 concerning certain related party transactions that RCI allegedly omitted from its financial statements, the SEC initiated an informal inquiry and the Company's Audit Committee engaged independent outside counsel to conduct an internal review.  On this news, the Company's share price fell $1.67, or over 7%, to close at $20.48 per share on May 13, 2019, on unusually heavy trading volume.

25.     On July 18, 2019, after the market closed, Defendants shocked the market again when they revealed that BDO, RCI's independent registered public accounting firm, had resigned, just two years after being retained by RCI.  BDO cited concerns relating to the review process of the Audit Committee's special committee, which was formed to conduct an independent internal review ("Special Committee"), and its appointment of an independent outside counsel ("Special Counsel").  Specifically, BDO reported that the Defendants had effectively thwarted the internal review, had not performed sufficient investigatory procedures, and had not taken timely and appropriate remedial action in response to certain internal control deficiencies.  On this news, the Company's share price fell $2.18, or 12.95%, to close at $14.65 per share on July 19, 2019, on unusually heavy trading volume.

26.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misrepresented and/or failed to disclose to investors: (1) that RCI's internal controls over financial reporting were woefully inadequate, and even after Defendants disclosed the existence of certain internal control deficiencies, Defendants continued to misrepresent and conceal the extent of the problems; (2) RCI's numerous material related party transactions, executive compensation to paid Langan and Reese in the form of perquisites, and material information regarding its executives and directors; (3) that these practices were reasonably likely to lead to regulatory scrutiny of the Company; (4) that, as a result of investigations into the Company's governance, the Company would be unable to timely file its financial statements; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

27.     As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE

28.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

29.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

30.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

31.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.      PARTIES

### A.      Plaintiffs

32.      Plaintiff Roger DeMaggio, as set forth in the certification filed at Docket No. 12-1, incorporated by reference herein, purchased RCI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

33.      Plaintiff Patrick Prahl, as set forth in the certification filed at Docket No. 12-1,

incorporated by reference herein, purchased RCI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

34.    Plaintiff Justin Kinslow, as set forth in the certification filed at Docket No. 12-1, incorporated by reference herein, purchased RCI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

35.    Plaintiff Joseph Milo, as set forth in the certification filed at Docket No. 12-1, incorporated by reference herein, purchased RCI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

36.    Plaintiff Edgar M. Kee, as set forth in the certification filed at Docket No. 12-1, incorporated by reference herein, purchased RCI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B.    Defendants**

37.    Defendant RCI is incorporated under the laws of Texas and its principal executive offices is located in Houston, Texas and consists of a 21,000-square foot corporate office and an 18,000-square foot warehouse facility.  Throughout the Class Period, RCI's common stock was actively traded on the NASDAQ Global Market ("NASDAQ") under the symbol "RICK."

38.    Defendant Langan has been a director of RCI since 1998, and has been the President, Chief Executive Officer ("CEO") and Chairman since 1999.[9]  As a member of the board of directors, Langan was charged with reviewing related party transactions on an ongoing

---

[9] Langan also served as the Company's Chief Financial Officer from March 29, 1999 to May 29, 2007, when Defendant Marshall joined the Company.

basis to prevent conflicts of interest.  Langan has been in the hospitality industry since 1989, specializing in sports bars/restaurants and adult entertainment nightclubs.  Langan built the XTC Cabaret nightclub brand and merged it into RCI in 1998, expanding the scope of the Company.

39.     As CEO, Langan signed RCI's: FY 2016 Form 10-K; Q1 FY 2017 10-Q filed with the SEC on February 9, 2017; Q2 FY 2017 10-Q filed with the SEC on May 9, 2017; Q3 FY 2017 10-Q filed with the SEC on August 9, 2017; proxy materials on Schedule 14A filed with the SEC on August 10, 2017; FY 2017 Form 10-K; Q1 FY 2018 10-Q filed with the SEC on March 7, 2018; Q2 FY 2018 10-Q filed with the SEC on May 10, 2018; Q3 FY 2018 10-Q filed with the SEC on August 9, 2018; FY 2018 Form 10-K; and Q1 FY 2019 10-Q/A.

40.     Langan also is a Director of Tannos Land Holding I, LLC, a Member of Tannos Land Holding II, LLC, a Director of Tannos Land Holding III, LLC, a Manager and Director of Tannos Land Holdings IV, LLC, and a Manager and Director of Tannos Land Holdings V, LLC.

41.     Defendant Marshall has been RCI's Chief Financial Officer ("CFO") since May 2007.  Before joining RCI, Marshall was previously controller of Dorado Exploration, Inc., an oil and gas exploration and production company, from February 2007 to May 2007. Marshall previously served as Chief Financial Officer of CDT Systems, Inc., a publicly held water technology company, from July 2003 to January 2007.  Marshall graduated from Texas State University in 1972. Marshall began his public accounting career with the international accounting firm, KMG Main Hurdman and became a Certified Public Accountant in 1974.  After the firm's merger with Peat Marwick, Marshall served as an audit partner at KPMG for several years.  After leaving KPMG, Marshall was partner in charge of the audit practice at Jackson & Rhodes in Dallas from 1992 to 2003, where he specialized in small publicly held companies, among them the newly public Rick's Cabaret.

42.     As CFO, Marshall signed RCI's: FY 2016 Form 10-K; Q1 FY 2017 10-Q filed

with the SEC on February 9, 2017; Q2 FY 2017 10-Q filed with the SEC on May 9, 2017; Q3 FY 2017 10-Q filed with the SEC on August 9, 2017; 2017 FY Form 10-K; Q1 FY 2018 10-Q filed with the SEC on March 7, 2018; Q2 FY 2018 10-Q filed with the SEC on May 10, 2018; Q3 2018 FY 10-Q filed with the SEC on August 9, 2018; FY 2018 Form 10-K; and Q1 FY 2019 10-Q/A.

43.     Defendant Jenkins served as an independent director from June 2001 until his resignation on August 8, 2019, following the Audit Committee's supplemental disclosure of Jenkins' bankruptcies, which should have been included in his biographical information in SEC filings since 2010.  During the Class Period, Jenkins was a member of the Audit, Compensation, and Nominating Committees and the Audit Committee's designated "financial expert."  As a member of the Audit Committee, Jenkins was charged with reviewing and helping to ensure the integrity of RCI's financial statements as well as reviewing the adequacy of RCI's internal controls in the areas of financial reporting, audits, treasury operations, corporate finance, managerial, financial and SEC accounting, compliance with law, and ethical conduct.  According to RCI's Audit Committee charter, Jenkins was responsible for "review[ing] and approv[ing] all related party transactions."  According to the Compensation Committee charter, Jenkins was responsible for "review[ing] or mak[ing] recommendations with respect to the salaries of . . . employees as may be from time to time referred to the Committee."

44.     Defendant Nour-Dean Anakar served as an independent director, and a member of the Audit, Compensation, and Nominating Committees at all relevant times.  As a member of the board of directors, Nour-Dean Anakar was charged with reviewing related party transactions on an ongoing basis to prevent conflicts of interest.  As a member of the Audit Committee, Nour-Dean Anakar was charged with reviewing and helping to ensure the integrity of RCI's financial statements as well as reviewing the adequacy of RCI's internal controls in the areas of financial

reporting, audits, treasury operations, corporate finance, managerial, financial and SEC accounting, compliance with law, and ethical conduct. According to RCI's Audit Committee charter, Nour-Dean Anakar was responsible for "review[ing] and approv[ing] all related party transactions." According to the Compensation Committee charter, Defendant Nour-Dean Anakar was responsible for "review[ing] or mak[ing] recommendations with respect to the salaries of . . . employees as may be from time to time referred to the Committee." Nour-Dean Anakar's brother, Ed Anakar, is RCI's Director of Operations – Club Division.

45.     Defendants Langan, Marshall, Jenkins, and Nour-Dean Anakar (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of RCI's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

### C.     Related Third Parties

46.     Creative Steel Designs ("Creative Steel") is a furniture fabrication company owned by Richard Langan, Defendant Langan's father. Sherwood Forest Creations LLC ("Sherwood Forest") is a furniture fabrication company owned by Adam Langan, Defendant Langan's brother. According to the Company's Form 8-K filed with the SEC on July 22, 2019, a

post-Class Period filing regarding the previously undisclosed related party transaction, Creative Steel Designs was the predecessor company of Sherwood Forest Creations LLC.

47.     In fiscal years 2016, 2017, and 2018, RCI utilized the services of Creative Steel Designs and/or Sherwood Forest Creations, to manufacture tables, chairs and other furnishings and provide ongoing maintenance for RCI's Bombshells locations.  Creative Steel and its successor Sherwood Forest and billed hundreds of thousands of dollars to RCI between 2016 and 2018: in fiscal 2016, Creative Steel billed RCI $176,864; in fiscal 2017, Creative Steel and Sherwood Forest billed RCI an total of $135,322; and in fiscal 2018, Sherwood Forest billed RCI $321,353.

48.     Ed Anakar ("Ed Anakar") is RCI's Director of Operations – Club Division and Defendant Nour-Dean Anakar's brother.  Ed Anakar is also a Director of Tannos Land Holding III, LLC and a Member of Tannos Land Holdings IV, LLC.

49.     Travis Reese has served as a Director and the Executive Vice President of RCI since 1999.  Reese also serves as the Director of Technology and as Corporate Secretary.  As a member of the board of directors, Reese was charged with reviewing related party transactions on an ongoing basis to prevent conflicts of interest.  Prior to joining RCI, Reese was a pilot with a number of airline companies.

50.     Louis Tannos ("Tannos") is the President of Tannos Construction & Development, LLC ("Tannos Construction") and one of the Principals of Tannos Land Holdings LLC.  Louis Tannos and Defendant Langan have a close personal and professional relationship.  Not only has Louis Tannos been awarded multiple lucrative construction contracts to build RCI's Nightclubs and Bombshells locations (*see* Exhibit A), Louis Tannos has enjoyed personal use of RCI's corporate jet, and Langan serves on multiple boards of Tannos holding companies, which are closely affiliated with Tannos Construction.  In multiple instances, Louis Tannos and

Defendant Langan are the only two board members:

a) The only two Directors of Tannos Land Holdings I, LLC are Louis Tannos and Defendant Langan.

b) The only three Members of Tannos Land Holdings II, LLC are Louis Tannos, Defendant Langan, and Jonah Tannos.

c) The only three Directors of Tannos Land Holdings III, LLC are Louis Tannos, Defendant Langan, and Ed Anakar.  Tannos Land Holdings III is a $10 million mixed-use, 63,400 square foot building in Friendswood, Texas.  The project broke ground in June 2018 and was expected to be completed in early 2019.[10]

d) Tannos Land Holdings IV, LLC is comprised of only one Director, Defendant Langan; two Managers, Louis Tannos and Defendant Langan; and one Member, RCI executive, Ed Anakar.

e) Tannos Land Holdings V, LLC is comprised of only one Director, Defendant Langan, and two Managers, Louis Tannos and Langan.

Tannos Construction is closely affiliated with the Tannos Land Holdings entities.  On information and belief, Tannos Construction develops commercial and industrial real estate purchased and held by Tannos Land Holdings.[11]  Tannos Construction prominently features its involvement in the construction of RCI's Bombshell restaurants on its company website.[12]  Attached hereto as Exhibit A is a compendium of publicly-available photos documenting Tannos Construction's substantial work on RCI's Nightclubs and Bombshells locations in 2017 and 2018.

51.    As a result of these close ties and personal financial and business interests of Defendant Langan in Tannos companies, Louis Tannos and the Tannos companies, including Tannos Construction, constitute related parties to RCI, requiring RCI to adhere to disclosure

---

[10]https://rebusinessonline.com/tannos-breaks-ground-on-10m-mixed-use-building-in-friendswood-texas/

[11] For example, it was reported that "Tannos Construction and Development, LLC completed Tannos Land Holdings in late 2015. The 9,000-square-foot center in downtown Friendswood features Anytime Fitness, Aria and Best Body in addition to a new office for Tannos Construction."  https://communityimpact.com/news/2016/01/20/development-updates-7/

[12] *See* https://tannosconstruction.com/commercial-construction/  *See also* Exhibit A hereto.

requirements of its numerous material related party transactions with Tannos Construction.

## IV.   ADDITIONAL SUBSTANTIVE ALLEGATIONS

### A.   Background:  RCI's Business

52.     RCI is a holding company engaged in various activities in the adult entertainment and hospitality industries and related businesses.  Through its approximately 111 subsidiaries, RCI operates approximately 43 establishments that offer live adult entertainment, and/or restaurant and bar operations.[13]

53.     RCI operates its Nightclubs business under the following brand names: Rick's Cabaret, Jaguar's Club, Tootsie's Cabaret, XTC Cabaret, Club Onyx, Hoops Cabaret and Sports Bar, Scarlett's Cabaret, Temptations Adult Cabaret, Foxy's Cabaret, Vivid Cabaret, Downtown Cabaret, Cabaret East, The Seville, Silver City Cabaret, and Kappa Men's Club.  RCI also operates dance clubs under the brand name Studio 80.

54.     RCI's Bombshells business consists of restaurants and sports bars in Houston, Dallas, Austin, Spring and Pearland, Texas operating under the brand name Bombshells Restaurant & Bar.  The Bombshells restaurant concept includes décor that pays homage to all branches of the U.S. military.  Locations feature local DJs, large outdoor patios, and more than 75 flat screen TVs for watching sports.  All food and drink menu items have military names. Bombshell Girls, with their military-inspired uniforms, are waitresses and interact with guests.

### B.   During the Class Period, Defendants Misleadingly Assured Investors That Proper Auditing Procedures & Internal Controls Were In Place

55.     In the wake of the Enron and WorldCom accounting fraud scandals, the Sarbanes-Oxley Act of 2002 ("SOX") was enacted to "protect investors by improving the accuracy and reliability of corporate disclosures."  Pursuant to SOX and the Exchange Act, a registrant's CEO

---

[13] Through its subsidiaries, RCI also operates a business communications company serving the multibillion-dollar adult nightclubs industry.

and CFO are required to sign and certify, in each annual or quarterly report, that the report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.  The officers must also sign and certify that they have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report, and have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date.  Finally, the officers must certify that they have disclosed to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function), all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data, and have identified for the issuer's auditors any material weaknesses in internal controls, and any fraud that involves management or other employees who have a significant role in the issuer's internal controls.  *See* SOX, Section 302 (15 U.S.C. § 7241).

56.     Regarding its responsibility to maintain effective internal controls over financial reporting, RCI stated in its FY 2016 Form 10-K, that "[m]anagement is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f)."   RCI went on to explain that "[i]n making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in '*Internal Control—Integrated Framework (2013)*.'"

57.     Following this explanation, Defendants stated that "[b]ased on this assessment, we believe that, as of September 30, 2016, ***our internal control over financial reporting was effective based on those criteria***.  Our internal control over financial reporting as of September 30, 2016, has been audited by Whitley Penn LLP, an independent registered public accounting

firm, as stated in their report which is included herein."

58.     On February 9, 2017, May 9, 2017, and August 9, 2017, the Company filed its Form 10-Q for the periods ending December 31, 2016, March 31, 2017 and June 30, 2017, respectively.   In both the FY 2016 annual and the 2017 quarterly reports, Defendants misleadingly reassured investors that RCI's internal controls were effective.

59.     In each filing, Defendants stated: "[u]nder the supervision and with the participation of the Company's senior management, including the Company's chief executive officer and chief financial officer, the Company conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of June 30, 2017.  In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *"Internal Control—Integrated Framework (2013)."*   Based on this evaluation, the Company's chief executive officer and chief financial officer concluded [for the currently reported period] that the Company's disclosure controls and procedures were effective such that the information relating to the Company, including consolidated subsidiaries, required to be disclosed in the Company's SEC reports (i) is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (ii) is accumulated and communicated to the Company's management, including the Company's chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure."

**C.     Defendants Knew RCI's Internal Controls Suffered Material Weakness Not Reported By The Company Because Defendants Were Exploiting Those Weaknesses To Obtain Undisclosed Perquisites**

**1.     Defendants Underreported Executive Compensation**

60.     Unbeknownst to investors, as enabled by RCI's insufficient internal controls over

financial reporting, Defendants regularly used Company resources for their own personal recreational purposes, and relatedly underreported executive income throughout the Class Period.

61.     During fiscal years 2016 and 2017, Defendant Langan and Reese repeatedly used RCI's corporate jet for personal use, but failed to disclose any of this use as income as required by SEC regulations.   This personal use included, *inter alia*, using the corporate jet for recreational purposes to fly a route in the shape of the Houston Texans logo to post on Facebook and personally entertaining Defendant Langan's friend and business associate, Louis Tannos.



62.     The following screenshots of online posts made by Louis Tannos show Tannos enjoying use of the RCI corporate jet with Defendant Langan in 2017 and 2018:





63.     Under Item 402, Defendants were required to provide clear, concise, and understandable disclosure of all plan and non-plan compensation awarded to, earned by, or paid to the named executive officers and directors in RCI's financial statements filed with the SEC during the Class Period.  17 C.F.R. § 229.402.  Item 402 also required non-boilerplate disclosure of the Company's executive compensation policies in the Compensation Discussion and

Analysis. Defendants were charged with disclosing "all other compensation" provided to executives, including all perquisites and other personal benefits—which would include personal use of the Company aircraft.

64.     In RCI's financial and proxy statements filed with the SEC in 2016 and 2017, Defendants did not disclose *any* of Reese and Langan's personal use of the corporate jet as required reportable compensation. Indeed, in the 2017 proxy statement filed with the SEC on August 10, 2017, Defendants falsely told investors that the Company did not provide their named executive officers with any perquisites, except for an automobile, when in fact, Langan and Reese routinely used the corporate jet for their own personal use.

65.     While RCI did disclose *some* of Langan and Reese's personal use of the corporate jet in 2018, the FY 2018 Form 10-K still materially underreported Defendant Langan and Reese's compensation due to their personal use of the corporate jet, understating that aspect of their compensation by approximately 69% and 73%, respectively.[14]

66.     The compensation reported in RCI's Class Period Form 10-Ks and proxy statement was reviewed by RCI's Compensation Committee, which was comprised of four supposedly "independent" directors: Defendant Jenkins; Defendant Nour-Dean Anakar; Luke Lirot; and Yura Barabash. Notwithstanding the failure to disclose Langan's and Reese's use of the jet as compensation in violation of Item 402, the Compensation Committee recommended that the Compensation Discussion and Analysis be included in the Company's Form 10-Ks.

67.     In addition, Defendants violated disclosure requirements relating to two members

---

[14] The Company purportedly calculated the value of personal aircraft usage using the method required for imputation of income for tax purposes, known as Standard Industry Fare Level (SIFL) rather than the aggregate incremental cost method, as required by Instruction 2 to Item 402(b)(2)(iii)(C) of Regulation S-K of the Exchange Act for disclosure of perquisites. For each perquisite included in the All Other Compensation column for which a company must disclose the separate value in a footnote, the company must also describe in the footnote its methodology for calculating aggregate incremental cost.

of the Compensation Committee.  Specifically, Defendants failed to disclose that Defendant

Jenkins had filed for personal bankruptcy twice during his tenure on the board as required by

Item 401 (*see infra* Sec. IV.C.3).  Moreover, Defendants also failed to disclose Ed Anakar's

(Defendant Nour-Dean Anakar's brother) substantial RCI salary, as required by Item 404 (*see*

*infra* Sec. IV.C.2).

### 2.    Defendants Failed To Report Material Related Party Transactions

68.    Related party transactions must be disclosed under SEC regulations, NASDAQ,

and GAAP.  This is because a related party's influence might result in transaction terms that

either differ from terms negotiated between independent parties, or transactions that would not

have otherwise occurred.  Another rationale for disclosing related party transactions to investors

is that these types of transactions could be structured to achieve specific accounting results that

are inconsistent with their substance.  In addition, such financial relationships might create a

significant incentive or pressure to perpetrate fraudulent financial reporting, or create an

opportunity for self-dealing or unjust enrichment.

69.    Accordingly, Item 404 required Defendants to describe, in RCI's financial

statements filed with the SEC during the Class Period, "any transaction, since the beginning of

the registrant's last fiscal year, in which the registrant was or is to be a participant and the

amount involved exceeds $120,000, and in which any related person had or will have a direct or

indirect material interest."  17 C.F.R. § 229.404(a).

70.    For purposes of Item 404, a "related person" is defined by Regulation S-K as

including any director or executive officer of the Company, any nominee for director, or any

immediate family member of a director or executive officer of the registrant or of any nominee

for director, or any 5% or greater shareholder.  *See Instructions to Item 404(a)*.

71.    In addition to the disclosure requirements under Item 404, Regulation S-X 4-

08(k)(1) required Defendants to disclose the amounts of related party transactions on the face of the balance sheet, statement of comprehensive income, or statement of cash flows.   17 C.F.R. § 210.4-08.

72.   Additionally, NASDAQ rule 5630(a) required Defendants to disclose related party transactions pursuant to Item 404 of Regulation S-K.

73.   GAAP also required disclosure of related party transactions.  Per ASC 850-10-50-1 (formerly FAS No. 57), RCI's financial statements filed with the SEC during the Class Period, should have included disclosures of material related party transactions.   Under GAAP, the disclosures should have included, *inter alia*:

a.   The nature of the relationship(s) involved.

b.   A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

c.   The dollar amounts of the transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period.

d.   Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. Notes or accounts receivable from officers, employees, or affiliated entities must be shown separately and not included under a general heading such as notes receivable or accounts receivable.

ASC 850-10-50-2.

74.   GAAP requires these disclosures because **"[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist."**  ASC 850-10-50-5.

75.   Despite these mandated disclosure requirements, Defendants concealed numerous related party transactions from investors during the Class Period.

76.   Defendants concealed that one of RCI's "independent" directors, Nour-Dean

Anakar, was the brother of RCI's director of operations, Ed Anakar.  RCI was paying Ed Anakar, the director of operations for RCI's club division, a handsome salary while violating disclosure requirements.  As Ed Anakar was the brother of Defendant Nour-Dean Anakar, an RCI director and a member of the Audit, Nominating, and Compensation Committees, Defendants were required to disclose in RCI's financial statements filed with the SEC during the Class Period that RCI paid Ed Anakar employment compensation of $471,154, $450,000 and $375,000 during the fiscal years ended September 30, 2018, 2017 and 2016, respectively.

77.    Defendants also concealed from investors that RCI hired and paid hundreds of thousands of dollars to companies operated by the father and brother of CEO Langan, for work purportedly done on RCI's Bombshells locations during the Class Period.  RCI hired Sherwood Forest Creations, owned by Adam Langan, Defendant Langan's brother, and its predecessor, Creative Steel Designs, owned by Richard Langan, Defendant Langan's father, but did not disclose the hundreds of thousands of dollars paid by RCI to these related entities during the Class Period.  Specifically, Defendants omitted from RCI's financial statements filed with the SEC during the Class Period that RCI paid Sherwood Forest $321,353 in FY 2018, a total of $135,322 to Sherwood Forest and Creative Steel in FY 2017, and $176,864 to Creative Steel in FY 2016.

78.    Defendants also concealed numerous material related party transactions between RCI and Louis Tannos, including, at least, the construction of RCI's new multi-million dollar corporate headquarters in Houston, Texas in 2016, and the construction of at least one Nightclubs location in 2017 and numerous Bombshells locations in 2017 and 2018.  *See* Exhibit A.

79.    Former Employee #1 ("FE1") was an officer in the Human Resources and a benefit administrator for RCI in Houston, Texas, from May 2016 through January 2018.  When

FE1 was first hired, FE1 worked out of RCI's former corporate office until Langan had a new site built by Tannos Construction.  According to FY 2016 Form 10-K, RCI moved into its new corporate facility in October 2016.  According to the same Form 10-K, RCI entered into a $4.7 million construction loan for its new corporate headquarters building, which was fully funded upon the completion of the construction in October 2016.  Despite Defendant Langan's close personal and professional relationship with Louis Tannos and Langan's role as a Director, Manager, and Member of numerous Tannos holding companies, no payments made by RCI to the related Tannos entity for Tannos' construction of RCI's new headquarters were disclosed in the Company's FY 2016 Form 10-K.

80.     As reflected in publicly-available photographs obtained from the Tannos Construction website and otherwise publicly posted by Louis Tannos, his company also constructed at least one Nightclubs location in 2017 and numerous new Bombshells locations in 2017 and 2018.  *See* Exhibit A.  These construction projects clearly exceeded the required minimum disclosure amount of $120,000.

81.     Given that the above-described transactions directly benefitted Defendant Langan's and/or Defendant Nour-Dean Anakar's own business interests, or those of their family members, these transactions cannot be presumed to have been carried out on an arm's-length basis.  The transactions should have been disclosed to investors in RCI's financial statements as related party transactions.

82.     Defendants Langan and Nour-Dean Anakar—who had a personal incentive to conceal transactions involving their own related and conflicted business interests and/or the interests of their immediate family members—were in fact **charged with reviewing and reporting the related party transactions** in their roles as CEO and Director respectively. Investors rely on RCI and its Board of Directors to review related party transactions on an

ongoing basis to prevent conflicts of interest, and to disclose related party transactions fully and transparently in accordance with SEC rules.

83.     According to RCI, its Board of Directors reviews a transaction for the affiliations of the director, officer, or employee and the affiliations of such person's immediate family.  RCI claims that its Board of Directors will approve or ratify a transaction only if the Audit Committee "determines that the transaction is consistent with our best interests and the best interests of our stockholders."  Clearly RCI's Board of Directors, including Defendants Langan and Nour-Dean Anakar, were not in position to neutrally and fairly evaluate conflicts of interest—and disclose as required—related party transactions, especially those involving family members.

84.     Indeed, BDO expressed concerns and resigned on July 12, 2019 over the fact that these executives unduly restricted the scope of the internal review announced on May 10, 2019, to investigate, among other things, related party transactions.

### 3.     Defendants Omitted Required Information Regarding A Director's Bankruptcies

85.     Throughout the Class Period, Defendants also violated the disclosure rules set forth in Item 401 of Regulation S-K.  17 C.F.R. § 229.401.  Item 401 requires that publicly traded companies disclose any director's involvement in bankruptcy proceedings.  Item 401 further requires, in relevant part, that the company describe any petition under the Federal bankruptcy laws filed by a director during the past ten years that is material to an evaluation of the ability or integrity of any director, person nominated to become a director, or executive officer of the company.

86.     Defendants did not disclose that Defendant Jenkins, the designated "financial expert" of the Company's Audit Committee, filed voluntary petitions for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas in August, 2010 and

again in October, 2015.[15]

87.     The materiality of this information is unquestionable.   Throughout the Class Period, RCI relied on the supposed expertise of its Audit Committee's "financial expert" to provide oversight and guidance regarding significant financial matters, including accounting and financial reporting processes.   Item 401 requires disclosure of officer/director bankruptcies to allow investors to make an informed decision when evaluating the officer/director's fitness to serve in an executive or director position.   Failure to disclose Jenkins's bankruptcies deprived RCI's investors of the opportunity to properly evaluate RCI's proxy statements and/or their investment in RCI generally.   Not surprisingly, only a few months following the disclosure of this omitted material information, Jenkins resigned from RCI's Board of Directors.

### D.     RCI Partially Disclosed Material Weakness In Its Internal Controls, But Misleadingly Assured Investors Adequate Remedial Measures Were In Place

88.     After ensuring investors for over a year that RCI's internal controls were adequate and effective, Defendants finally partially disclosed the existence of some material weaknesses in the Company's internal controls over financial reporting in RCI's FY 2017 Form 10-K, filed with the SEC on February 14, 2018, but misleadingly suggested these problems were limited to three discrete areas and only existed as of September 30, 2017.   The disclosed weaknesses related to complex accounting and management estimates, financial statement preparation and review, and information technology and segregation of duties.   Specifically, the Company stated:

> Based on our evaluation under the criteria set forth in Internal Control — Integrated Framework (2013), our management concluded that, as of September 30, 2017, our internal control over financial reporting was not effective because of the identification of material weaknesses as discussed below.
> ***
>
> At September 30, 2017, we did not design or maintain an effective control

---

[15]  For the 2010 bankruptcy, Jenkins's total liabilities were $1.5 million versus assets of $971,000, which included a boat worth approximately $250,000.   For the 2015 bankruptcy, Jenkins's total liabilities were $397,000 versus assets of $544,000.

environment which was primarily attributable to not having a sufficient complement of accounting and financial reporting personnel with an appropriate level of knowledge to address our financial reporting requirements which contributed to the following material weaknesses:

Control Activities
- Complex Accounting and Management Estimates – We did not appropriately design or maintain effective controls over complex accounting and management estimates related to assets held for sale, business combinations, cost method investments, income taxes, and the impairment analyses for indefinite lived intangible assets, goodwill, and property and equipment which resulted in certain instances of incorrect accounting and improper valuation decisions.
- Financial Statement Preparation and Review – We did not design or maintain effective controls to support accurate accounting, reporting, and disclosures within our Form 10-K.
- Information Technology and Segregation of Duties - We did not design or maintain effective controls to prevent unauthorized access to certain systems, programs and data, and provide for periodic review and monitoring of access including review of security logs and analysis of segregation of duties conflicts. Furthermore, a number of individuals had access to record journal entries but there is no procedure in place to ensure that all journal entries recorded are reviewed.

89.     Moreover, in same Form 10-K, Defendants misleadingly assured investors that effective remedial measures were in place:

We have, and continue to, identify and implement actions to improve our internal control over financial reporting and disclosure controls and procedures including actions to enhance our resources and training with respect to financial reporting and disclosure responsibilities, and increase utilization of accounting system functionality, with continued oversight from the Audit Committee.

***We have taken, and continue to take, the actions described below to remediate the identified material weaknesses***.  As we continue to evaluate and work to improve our internal controls over financial reporting, our senior management may determine to take additional measures to address control deficiencies or determine to modify the remediation efforts described in this section.  While the Audit Committee and senior management are closely monitoring the implementation, until the remediation efforts discussed in this section, including any additional remediation efforts that our senior management identifies as necessary, are completed, tested and determined effective, the material weaknesses described above will continue to exist.

Control Environment
Our Board of Directors has directed senior management to ensure that a proper, consistent tone is communicated throughout the organization, which emphasizes

the expectation that previously existing deficiencies will be rectified through implementation of processes and controls to ensure strict compliance with US GAAP and regulatory requirements.  We also have taken steps to effect a proper tone through our policies and personnel.

Control Activities

Strengthening internal controls over complex accounting and management estimates – Subsequent to September 30, 2017, we have committed to resolve the controls over complex accounting and estimates and prevent instances of incorrect accounting and improper valuation decisions, by hiring valuation experts to assist us with our goodwill, indefinite-lived intangible assets, and property and equipment impairment analyses whenever necessary and with the analysis and accounting for business combinations, income taxes, and other complex accounting matters.

Strengthening internal controls over financial reporting and disclosures - We believe the new Enterprise Resource Planning ("ERP") system described below will assist us in strengthening the controls over financial reporting, and we are committed to also add an overlay of review of our financial statements during our financial reporting process. We have also upgraded our accounting staff with certain newly hired accountants.

We have also committed to hiring an outsourced internal audit group to assist with the controls over these processes and other internal control functions.

With the oversight of our Board of Directors and Audit Committee, the Company has also begun taking steps and plans to take additional measures to remediate the underlying causes of the material weaknesses.

Strengthening the information technology application and related segregation of duties issues – We were previously aware of the limitations of our accounting software and had been in the planning/implementation process of replacing the software for many months prior to September 30, 2017. In October 2017, we completed the conversion to a new ERP system which, along with changes to our manual internal controls, we believe will resolve the issues detailed above relating to the information systems and segregation of duties. The new ERP system has features that prevent unauthorized access to certain programs and data, and provides for periodic review and monitoring of access including review of security logs and analysis of segregation of duties conflicts. These features include proper segregation of duties within our journal entry process. We have also hired a Director of ERP & Business Intelligence.

90.    The Company's fiscal year 2018 quarterly reports, filed on March 7, 2018, May 10, 2018, and August 9, 2018, each repeated the same material weakness identified in the FY 2017 Form 10-K.  Moreover, in each one, the Company again misleadingly assured investors

that the Company had taken, and was continuing to implement, effective remedial measures, stating:

> As disclosed in our most recent Annual Report on Form 10-K, *we have, and continue to, identify and implement actions to improve our internal control over financial reporting and disclosure controls* and procedures including actions to enhance our resources and training with respect to financial reporting and disclosure responsibilities, and increase utilization of accounting system functionality, with continued oversight from the Audit Committee.

91. The Company again repeated the same three material weaknesses in its FY 2018 Form 10-K, filed with the SEC on December 31, 2018, but added that the material weaknesses were due to the Company's failure to have "a sufficient complement of accounting, financial, and information technology personnel with an appropriate level of knowledge to assess internal control risks, address known internal control weaknesses, and address the Company's overall financial reporting and information technology requirements. As it relates to monitoring, we did not perform timely and ongoing evaluations to ascertain whether the components of internal control are present and functioning." Therein, the Company, in relevant part, stated:

> Control Activities
> - Revenues – We did not properly design or maintain effective controls over the segregation of cash counts at our nightclubs and restaurants, the information produced by our point-of-sale systems, other revenues generated outside the point-of-sale system, and the review of journal entries used to record revenue transactions.
> - Complex Accounting and Management Estimates – We did not properly design or maintain effective controls over complex accounting and management estimates related to the impairment analyses for indefinite lived intangible assets, goodwill, and property and equipment, and the accounting for income taxes, assets held for sale, business combinations, debt modifications, and useful lives of leasehold improvements, which resulted in certain instances of incorrect accounting and improper valuation decisions.
> - Financial Statement Close and Reporting – We did not properly design or maintain effective controls, in aggregate, over the period end financial close and reporting process to enable timely reporting of complete and accurate financial information. Specifically, we lacked controls to define financial statement review thresholds, consistently perform independent reviews of journal entries prior to posting, and consistently prepare, approve, and retain adequate supporting documentation for financial

statement balances and the related footnote disclosures.

- Information Technology – We did not properly design or maintain effective controls to prevent unauthorized access to certain systems, programs and data, and provide for periodic review and monitoring of access and changes in programs, including review of security logs and analysis of segregation of duties conflicts.

- Segregation of Duties – We did not maintain effective policies, procedures, or controls in aggregate to ensure adequate segregation of duties within the Company's business processes, financial applications, and IT systems. Specifically, we did not have appropriate controls in place to adequately assess the segregation of job responsibilities and system user access for initiating, authorizing, and recording transactions.

92.   Once again, Defendants misleadingly assured investors that effective remedial measures were being implemented to address the material weaknesses in internal controls:

We have, and continue to, identify and implement actions to improve our internal control over financial reporting and disclosure controls and procedures including actions to enhance our resources and training with respect to financial reporting and disclosure responsibilities, and increase utilization of accounting system functionality, with continued oversight from the Audit Committee.

***We have taken, and continue to take, the actions described below to remediate the identified material weaknesses.*** As we continue to evaluate and work to improve our internal controls over financial reporting, our senior management may determine to take additional measures to address control deficiencies or determine to modify the remediation efforts described in this section. While the Audit Committee and senior management are closely monitoring the implementation, until the remediation efforts discussed in this section, including any additional remediation efforts that our senior management identifies as necessary, are completed, tested and determined effective, the material weaknesses described above will continue to exist.

Control Environment, Risk Assessment and Monitoring
Our Board of Directors has directed senior management to ensure that a proper, consistent tone is communicated throughout the organization, which emphasizes the expectation that previously existing deficiencies will be rectified through implementation of processes and controls to ensure strict compliance with U.S. GAAP and regulatory requirements. We also have taken steps to effect a proper tone through our policies and personnel. To effect this, we have hired an external consulting firm to effectively act as an internal audit department to assist in the organizational risk assessment, identification of control activities, and the enhancement of ongoing monitoring activities related to such controls.

Control Activities
Strengthening the controls and processes regarding the recording and reporting of revenue – Currently, one of our point-of-sale ("POS") system providers does not

issue an SOC 1 report. An SOC 1 Report (System and Organization Controls Report) is a report on Controls at a Service Organization which are relevant to user entities' internal control over financial reporting. As a result of the non-issuance of this report by the provider, it is necessary for us to use alternative procedures to gain the required level of confidence regarding the reliability of this system to accurately report sale information. In the case of credit card sales, data is effectively processed using other third-party providers with whom we have a higher degree of confidence. We will work to implement stronger controls regarding the verification of data from the POS provider if no service provider internal controls adequacy report can be obtained. In the case of cash sales, we would seek to point to compensating detective controls, such as nightly cash counts and monthly detailed revenue reconciliations to potentially detect any irregularities. Such controls will be evaluated for proper segregation of duties both in the nightly cash counts and in the related journal entries to remediate controls over both point-of-sale and other revenues. We would seek to strengthen these controls in the future to provide the required level of confidence necessary to prevent a material weakness.

Strengthening internal controls over complex accounting and management estimates and financial statement preparation – Subsequent to September 30, 2018, we have committed to resolve the controls over complex accounting and estimates and prevent instances of incorrect accounting, incorrect financial statement preparation and improper valuation decisions, by increasing our own level of competency as well as using third-party consultants to assist where necessary such as with our goodwill, indefinite-lived intangible assets, and property and equipment impairment analyses whenever necessary and also using appropriate third-party resources to help with the analysis and accounting for assets held for sale, business combinations, income taxes, debt modifications, assessment of useful lives of leasehold improvements, and other complex accounting matters.

Strengthening internal controls over financial statement close and reporting – With the oversight of our Audit Committee, we have continued to take proactive steps and implement additional measures to remediate the underlying causes of the material weaknesses. We are taking significant steps to improve our risk assessment process and monitoring structure, as follows:

- The new ERP system described below has and will continue to assist us in strengthening the controls over financial reporting, and we have also added an overlay of review of our financial statements during our financial reporting process.

- On top of the ERP system described above, we have also implemented, in April 2018, a new monitoring and security software to automate our segregation of duties as well as access monitoring controls and generate compliance documentation. The effective implementation of this software remains in process as we evaluate both manual and automated controls impacted by segregation of duties.

- We have upgraded our accounting staff with certain newly hired

accountants.

- We have retained a more robust outside consulting firm to assist us in evaluating, redesigning and implementing necessary steps to maintain adequate internal controls. As this work did not begin until May 2018, we expect to have a much improved control structure with their assistance for an entire fiscal year in 2019.

- We will develop proper controls to evaluate monthly and quarterly financial statement variances.

- We will develop proper controls over the review and evaluation of financial statement balances and the related footnote disclosures.

- We will consider certain enhanced journal review procedures which will ensure that proper review can be executed and evidenced.

Strengthening the information technology application – We were previously aware of the limitations of our accounting software and had been in the planning/implementation process of replacing the software for many months prior to September 30, 2017. In October 2017, we completed the conversion to a new Enterprise Resource Planning ("ERP") system which, along with changes to our manual internal controls, we believe has resolved some of the issues detailed above relating to the information systems. The new ERP system has features that prevent unauthorized access to certain programs and data, and also provides for periodic review and monitoring of access including review of security logs. In addition to the ERP system, we are taking steps to improve monitoring of access to point-of-sale systems at remote locations, as well as review of change management protocols.

Strengthening our segregation of duties issues – The features mentioned above include proper segregation of duties within our journal entry process, including analysis of segregation of duties conflicts, which we hope to more fully utilize in fiscal year 2019. We have also hired a Director of ERP & Business Intelligence. In addition to the segregation of duties improvements, there will be continuing improvements in the controls that would mitigate any potential conflicts, most importantly regarding the length of time the controls have been operating effectively.

93.     BDO, RCI's auditor, also expressed an opinion on RCI's financial statements, but

took no position on whether management would actually implement the remedial measures

outlined in the FY 2018 Form 10-K, noting:

> In our opinion, ***RCI Hospitality Holdings, Inc. did not maintain, in all material respects, effective internal control over financial reporting as of September 30, 2018, based on the COSO criteria***.
>
> ***We do not express an opinion or any other form of assurance on management's statements referring to any corrective actions taken by the company after the date of management's assessment***.

### E.   The Truth Is Revealed Through a Series of Partial Disclosures

#### 1.   The SEC Launches an Inquiry and Defendants Delay Filing RCI's Q2 FY 2019 Form 10-Q

94.    On May 10, 2019, RCI filed a Form 12b-25 with the SEC stating it could not

timely file its quarterly report due to pending investigations.  The Company stated, in relevant

part:

> In mid- and late 2018, a series of negative articles about the registrant was
> anonymously published in forums associated with the short-selling community.
> ***Subsequently in 2019, the SEC initiated an informal inquiry***. In connection with
> these events, a special committee of the registrant's Audit Committee engaged
> independent outside counsel to conduct an internal review. The registrant and its
> management are cooperating with both the internal review and the SEC inquiry.
> Because the internal review is still ongoing, the registrant will be delayed in filing
> its Form 10-Q.

95.    On this news, the Company's share price fell $1.67, or over 7%, to close at $20.48

per share on May 13, 2019, on unusually heavy trading volume.

#### 2.   BDO Resigns As RCI's Auditor Due to Defendants' Failure to Sufficiently Investigate and Remedy Ongoing Internal Control Deficiencies

96.    On July 18, 2019, after the market closed, the Company revealed that BDO had

resigned as RCI's auditor because it disagreed with procedural aspects of the review process and

the Company's remedial measures.  According to RCI's Form 8-K filed on July 18, 2019:

> BDO stated that it believes the company has not performed sufficient
> investigatory procedures and has not taken timely and appropriate remedial action
> in response to certain deficiencies that BDO thinks exist in the way the internal
> review has been conducted, including: (i) undue restriction on the scope of the
> internal review; (ii) failure to initiate certain forensic procedures; (iii) refusal to
> provide BDO access to pertinent interview summaries and other documents; (iv)
> lack of assessment as to the impact of the matters identified to date on existing
> and future regulatory filings, including financial statements related footnotes; and
> (v) restrictions, based on privilege, hindering BDO's ability to properly shadow
> and evaluate the adequacy of the internal review.

97.    On this news, the Company's share price fell $2.18, or 12.95%, to close at $14.65

per share on July 19, 2019, on unusually heavy trading volume.

F.    **Post Class Period Admissions—Special Committee Reveals Defendants Violated Reporting Requirements**

98.    On July 22, 2019, RCI filed a Form 8-K with the SEC revealing the preliminary

findings of the Special Committee tasked with reviewing matters raised by an SEC inquiry.

99.    Regarding related party transactions, the Special Committee concluded that RCI's

FY 2018 Form 10-K should be supplemented as follows:

a.    We paid Ed Anakar, our director of operations – club division, employment compensation of $471,154, $450,000 and $375,000 during the fiscal years ended September 30, 2018, 2017 and 2016, respectively. ***Ed Anakar is the brother of Nourdean Anakar, a director and audit committee member of the company.***

b.    During the last three fiscal years we utilized the services of Sherwood Forest Creations, LLC and its predecessor, Creative Steel Designs, furniture fabrication companies that manufacture tables, chairs and other furnishings for our Bombshells locations, as well as providing ongoing maintenance. ***Sherwood Forest is owned by a brother of Eric Langan, our president and chief executive officer, and Creative Steel was owned by his father.*** Amounts billed to us for goods and services provided by Sherwood Forest were $321,353 in fiscal 2018, an aggregate of $135,322 by Sherwood Forest and Creative Steel in fiscal 2017, and $176,864 by Creative Steel in fiscal 2016. Sherwood Forest Creations continues to provide services to the company.

100.    Regarding required executive compensation disclosures for FY 2016-2018, the

Special Committee concluded:

a.    In the executive compensation disclosure, personal use of aircraft amounts were incorrectly calculated for fiscal 2018 and were inadvertently left out in 2017 and 2016. In 2018, we accounted for personal use of aircraft using a third-party consultant based on a standard industry fare level rate, which is an accepted compensation basis for IRS purposes. We have revised our methodology to account for personal use of aircraft to be the aggregate incremental cost of personal use of the company aircraft as calculated based on a cost-per-flight hour charge developed by a nationally recognized and independent service. The charge reflects the direct cost of operating the aircraft, including fuel, additives, lubricants, maintenance labor, airframe parts, engine restoration, major periodic maintenance, and an allowance for propeller maintenance. We added actual airport/hangar fees charged to the company on a per-flight basis. The charge does not include fixed costs that do not change based on usage, such as aircraft

depreciation, home hangar expenses, and general taxes and insurance.

Eric Langan and Travis Reese, our executive vice president, were allocated personal use of aircraft amounts in 2018, 2017 or 2016. The corrected amounts for personal use of aircraft for these two individuals is the following:

| Name | Year | Personal Use of Aircraft ($) |
|---|---|---|
| Eric S. Langan | 2018 | 96,797 |
| | 2017 | 79,748 |
| | 2016 | 55,101 |
| | | |
| Travis Reese | 2018 | 20,410 |
| | 2017 | 9,524 |
| | 2016 | 5,544 |

The above increases to personal use of aircraft amounts increases "all other compensation." The corrected all other compensation and total compensation for these two individuals is the following:

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Eric S. Langan | 2018 | 1,015,384 | - | - | 111,191 | 1,126,575 |
| | 2017 | 900,000 | - | - | 138,198 | 1,038,198 |
| | 2016 | 878,434 | - | - | 122,741 | 1,001,175 |
| | | | | | | |
| Travis Reese | 2018 | 346,854 | - | - | 56,227 | 403,081 |
| | 2017 | 320,000 | - | - | 48,228 | 368,228 |
| | 2016 | 299,945 | - | - | 41,663 | 341,608 |

101.    Regarding Board of Director disclosures, the Special Committee concluded that supplemental disclosure to the biographical information of Defendant Jenkins was required as follows:

Mr. Jenkins filed voluntary petitions for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas in August, 2010 and in October, 2015.

102.    In addition, the Audit Committee and Board of Directors reported that the following would be taken as a part of the implementation of a more robust corporate and accounting governance program:

- Appoint at least one new independent member to the board of directors to join the audit committee;

- Appoint a chief compliance officer who will report directly to the audit committee;

- Adopt an amended related party transaction policy strengthening the review process by the audit committee with respect to related party transactions, employment of family members and charitable contributions;

- Adopt an enhanced code of conduct policy;

- Engage third party internal audit consultants to report directly to the audit committee to assist in enhancing our internal audit program and to review corporate governance procedures;

- Adopt a disclosure committee charter to ensure that all relevant financial transactions requiring SEC disclosure are known by the responsible parties;

- Review employee benefit procedures;

- Adopt an airplane policy specifically outlining personal use by employees; and

- Sell the three residential homes owned by the company.

**G.     Further Post Class Period Revelations—Jenkins Resigns and The SEC Launches a Formal Investigation of Defendants**

103.    Following the July 22, 2019 announcement of RCI's Special Committee findings, which included a supplemental disclosure of Defendant Jenkins's 2010 and 2015 bankruptcies, on August 8, 2019, Jenkins resigned from RCI's board of directors.

104.    On September 24, 2019, RCI filed its FY 2019 quarterly report for the third quarter, which disclosed that the ***SEC's informal inquiry had transitioned into a formal investigation*** and further disclosed additional related party transactions that benefitted Defendant Langan's family members.

> In mid- and late 2018, a series of negative articles about the Company was anonymously published in forums associated with the short-selling community. Subsequently in 2019, the SEC initiated an informal inquiry. In connection with these events, a special committee of the Company's audit committee engaged independent outside counsel to conduct an internal review. Management of the Company fully cooperated with the internal review conducted by the special committee and its outside counsel. The board of directors is implementing the recommendations resulting from the internal review. As of the date hereof, the internal review has been completed subject to any ongoing cooperation with

regulatory authorities.

**Since the initiation of the informal inquiry by the SEC in early 2019, the Company and its management have fully cooperated and continue to fully cooperate with the SEC matter,** *which has now converted to a formal investigation and is ongoing.* At this time, the Company is unable to predict the duration, scope, result or related costs associated with the investigation. The Company is also unable to predict what, if any, action may be taken as a result of the investigation. Any determination by the SEC that the Company's activities were not in compliance with federal securities laws or regulations, however, could result in the imposition of fines, penalties, disgorgement, or equitable relief, which could have a material adverse effect on the Company.

\*\*\*

We used the services of Sherwood Forest Creations, LLC, a furniture fabrication company that manufactures tables, chairs and other furnishings for our Bombshells locations, as well as providing ongoing maintenance. Sherwood Forest is owned by a brother of Eric Langan. Amounts billed to us for goods and services provided by Sherwood Forest were $12,990 and $120,805 during the three and nine months ended June 30, 2019, respectively, and $107,044 and $221,605 during the three and nine months ended June 30, 2018, respectively. As of June 30, 2019 and September 30, 2018, we owed Sherwood Forest $7,903 and $73,377, respectively, in unpaid billings.

TW Mechanical LLC ("TW Mechanical") provided plumbing and HVAC services to both a third-party general contractor providing construction services to the Company, as well as directly to the Company during fiscal 2018 and 2019. ***TW Mechanical is 20% owned by the son-in-law of Eric Langan.*** Amounts billed by TW Mechanical to the third-party general contractor were $0 and $435,800 for the three and nine months ended June 30, 2019, respectively, and $120,000 and $120,000 for the three and nine months ended June 30, 2018, respectively. Amounts billed directly to the Company were $0 and $206 for the three and nine months ended June 30, 2019, respectively, and $2,965 and $2,965 for the three and nine months ended June 30, 2018, respectively. As of June 30, 2019 and September 30, 2018, we owed TW Mechanical $0 and $0, respectively, in unpaid direct billings.

105.    On February 13, 2020, Defendants filed the Company's Form 10-K for fiscal year

2019 (the "FY 2019 Form 10-K") wherein Defendants disclosed that the SEC investigation was

still ongoing:

Since the initiation of the informal inquiry by the SEC in early 2019, the Company and its management have fully cooperated and ***continue to fully cooperate with the SEC matter, which has now converted to a formal investigation and is ongoing.*** At this time, the Company is unable to predict the duration, scope, result or related costs associated with the investigation. The Company is also unable to predict what, if any, action may be taken as a result of

the investigation. Any determination by the SEC that the Company's activities were not in compliance with federal securities laws or regulations, however, could result in the imposition of fines, penalties, disgorgement, or equitable relief, which could have a material adverse effect on the Company.

106.    The FY 2019 Form 10-K further reported continued material weaknesses related to internal controls, but disclosed additional areas of material weaknesses, including those related to reporting related party transactions.   Defendants disclosed weaknesses "in the areas of management review of financial statement information, independent review of journal entries, ***disclosure of related party transactions*** and accounting for loss contingencies.   Based on this material weakness, the Company's management concluded that at September 30, 2019, the Company's internal control over financial reporting was not effective."

107.    RCI's new independent registered accounting firm, Friedman, LLP, expressed an adverse opinion on RCI's internal controls over financial reporting as of September 30, 2019:

> We have audited RCI Hospitality Holdings, Inc.'s (the "Company's") internal control over financial reporting as of September 30, 2019, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). ***In our opinion, because of the effect of the material weakness described in the following paragraph on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of September 30, 2019,*** based on criteria established in Internal Control—Integrated Framework (2013) issued by COSO.
>
> A material weakness is a control deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness has been identified and included in management's assessment: ***Ineffective financial statement close and reporting controls in the areas of management review of financial statement information, independent review of journal entries, disclosure of related party transactions and accounting for loss contingencies.***
>
> This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2019 consolidated financial statements, and this report does not affect our report dated February 13, 2020, on those consolidated financial statements.

*We do not express an opinion or any other form of assurance on management's statements referring to any corrective actions taken by the Company after the date of management's assessment.*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets and the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows of the Company, and our report dated February 13, 2020, expressed an unqualified opinion.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

108.    The Class Period begins on December 13, 2016.  On that day, RCI filed its FY 2016 Form 10-K with the SEC, which failed to disclose material related party transactions, under-reported executive compensation, materially misrepresented the state of RCI's internal controls over financial reporting, and misleadingly omitted the disclosure of two voluntary bankruptcy petitions filed by an RCI director.

### A.    Defendants' Materially Misleading Statements and Omissions Regarding Related Party Transactions

109.    On December 13, 2016, the Company filed its FY 2016 Form 10-K with the SEC. Regarding related party transactions, the Company stated, in relevant part: "We know of *no related transactions for the years ended September 30, 2016* and 2015."

110.    This statement was false and misleading because during FY 2016, RCI materially omitted Ed Anakar's salary of $375,000, which required disclosure as a related party transaction under Item 404 and GAAP based on the fact that Ed Anakar is the brother of Defendant Nour-Dean Anakar, a supposed independent Director and member of RCI's Audit, Nominating, and Compensation Committees.  The FY 2016 Form 10-K also materially omitted that RCI paid Creative Steel, a company owned by CEO's Langan's father, $176,864 for goods and services provided in fiscal year 2016, which also qualified as a required related party transaction disclosure under Item 404, GAAP, NASDAQ rule 5630, and Regulation S-X 4-08(k)(1).

Finally, the FY 2016 Form 10-K also failed to disclose that RCI hired Tannos Construction, a company with which Defendant Langan was closely affiliated both personally and professionally, to construct RCI's new corporate headquarters—a project which RCI took out a $4.7 million construction loan to complete.

111.    Defendants filed RCI's Definitive Proxy Statement on Schedule 14A for the 2017 Annual Meeting of Stockholders with the SEC on August 10, 2017 (the "2017 Proxy Statement").  Matters up for shareholder vote in the 2017 proxy and at RCI's annual shareholder meeting held on September 19, 2017, included the re-election of Defendants Langan and Nour-Dean Anakar as directors, a non-binding advisory vote on executive compensation, and a non-binding vote on the frequency of votes on executive compensation.  The 2017 Proxy Statement, which was signed by Langan, stated in relevant part under "Related Transactions" that "Presently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees. Except for these guarantees, ***we know of no related transactions that have occurred since the beginning of the fiscal year ended September 30, 2016*** or any currently proposed transactions."

112.    This statement was false and misleading because, during FY 2016, RCI failed to disclose Ed Anakar's salary of $375,000, which qualified as a related party transaction under Item 404 and GAAP due to the fact that Ed Anakar is the brother of Defendant Nour-Dean Anakar, a supposed independent director and member of RCI's Audit, Nominating, and Compensation Committees.  Additionally, the Company's 2017 Proxy Statement materially omitted that RCI paid Creative Steel, a company owned by CEO's Langan's father, $176,864 for goods and services provided in fiscal year 2016, which also qualified as a required related party transaction disclosure under Item 404, GAAP, NASDAQ rule 5630, and Regulation S-X 4-

08(k)(1).

113.    On February 14, 2018, the Company filed its FY 2017 Form 10-K with the SEC. Under Item 13, regarding certain relationships and related transactions, and director independence, the FY 2017 Form 10-K stated, "[p]resently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees. Except for these guarantees, *we know of no related transactions that have occurred since the beginning of the fiscal year ended September 30, 2017 or any currently proposed transactions in which we were or are to be a participant and the amount involved exceeds $120,000*."

114.    This statement was false and misleading because Defendants failed to disclose Ed Anakar's salary of $450,000, which qualified as a related party transaction under Item 404 and GAAP due to the fact that Ed Anakar is the brother of Defendant Nour-Dean Anakar, a supposed independent director and member of RCI's Audit, Nominating, and Compensation Committees. Additionally, the Company's FY 2017 Form 10-K materially omitted that RCI paid Creative Steel, a company owned by CEO's Langan's father, and Sherwood Forest, a company owned by CEO Langan's brother**,** an aggregate amount of $135,322 for goods and services provided in fiscal year 2017, which also qualified as a required related party disclosure under Item 404, GAAP, NASDAQ rule 5630, and Regulation S-X 4-08(k)(1).  The FY 2017 Form 10-K also failed to disclose that RCI hired Tannos Construction, a related party as alleged herein, to construct at least one Nightclubs location and one Bombshells location in 2017—projects that clearly cost in excess of the $120,000 minimum disclosure requirement for related party transactions in FY 2017.

115.    On December 31, 2018, the Company filed its FY 2018 Form 10-K with the SEC. Under Item 13, regarding certain relationships and related transactions, and director

independence, the FY 2018 Form 10-K stated, "[p]resently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees. In November 2018, we borrowed $500,000 from Ed Anakar, an employee of the Company and the brother of our director Nourdean Anakar. The note bears interest at the rate of 12% per annum and matures in November 2021. The note is payable in monthly installments of interest only with a balloon payment of all unpaid principal and interest due at maturity. Except for these above transactions, *we know of no related transactions that have occurred since the beginning of the fiscal year ended September 30, 2018* or any currently proposed transactions in which we were or are to be a participant and the amount involved exceeds $120,000."

116.    This statement was false and misleading because Defendants failed to disclose Ed Anakar's salary of $471,154, which qualified as a related party transaction under Item 404 and GAAP due to the fact that Ed Anakar is the brother of Defendant Nour-Dean Anakar, a supposed independent director and member of RCI's Audit, Nominating, and Compensation Committees. Additionally, the Company's FY 2018 Form 10-K materially omitted that RCI paid Sherwood Forest, a company owned by CEO Langan's brother, $321,353 for goods and services provided in fiscal year 2018, which also qualified as a required related party disclosure under Item 404, GAAP, NASDAQ rule 5630, and Regulation S-X 4-08(k)(1).[16] Finally, the FY 2018 Form 10-K also failed to disclose that RCI hired Tannos Construction, a related party as alleged herein, to construct at least three Bombshells locations in FY 2018—projects that clearly cost in excess of the $120,000 minimum disclosure requirement for related party transactions.

117.    During the same New Year's Eve 2018 earnings call, in response to direct analyst inquiry questioning Langan's involvement with Tannos Construction, Defendant Langan also

---

[16] According to the Company's annual report filed with the SEC on February 13, 2020, RCI paid Sherwood Forest $134,000 in FY 2019.

misrepresented and misleadingly downplayed his involvement with Tannos and his substantial personal financial interest in the Tannos companies.  In addition to downplaying his roles in Tannos companies, Langan downplayed and failed to disclose RCI's substantial related party transactions with Tannos in 2018:

> DARREN MCCAMMON: Okay. In the past, there's been a question about your relationship with Tannos Construction. Can you outline that for us just real quick?
>
> ERIC SCOTT LANGAN: ***Tannos Construction is a contractor that does some contracting work for us***.  I've made investments in some of his projects personally, some shopping centers in Friendswood, Texas, where RCI has no business or no - we don't do anything in Friendswood, Texas basically.  It's a smaller bedroom community in Houston, and ***yes, I've made some investments, but that's about the end of it.  Other than that, there's nothing to tell***.

118.    The foregoing statement was false and misleading because Langan misrepresented the nature of his relationship with Tannos and misleadingly downplayed the extent of his interest and involvement in Tannos companies, thus concealing his potential conflict of interest from investors.  In response to the analyst's direct questioning, Langan also misrepresented and failed to disclose the numerous material related party transactions that RCI had entered into with Tannos Construction in FY 2018, with RCI awarding Langan's close personal friend and financially interested business associate, Tannos, numerous lucrative construction projects.

## B.    Materially False and Misleading Executive Compensation Reporting

119.    On December 13, 2016, the Company filed its FY 2016 Form 10-K with the SEC. Regarding executive compensation, Defendants misleadingly reported that "***[t]he following table reflects all forms of compensation*** for services to us for the fiscal years ended September 30, 2016, 2015 and 2014 of our named executive officers":

Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Stock Awards (1) ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Eric S. Langan | 2016 | 878,434 | - | - | 67,640(2) | 946,074 |
| President and Chief Executive Officer | 2015 | 832,143 | - | - | 67,505 | 899,648 |
| | 2014 | 856,731 | 592,180 | - | 97,680 | 1,546,591 |
| | | | | | | |
| Phillip K. Marshall | 2016 | 255,866 | - | - | 26,038(2) | 281,904 |
| Chief Financial Officer | 2015 | 251,442 | - | - | 25,734 | 277,176 |
| | 2014 | 246,538 | - | - | 29,070 | 275,608 |
| | | | | | | |
| Travis Reese | 2016 | 299,945 | - | - | 36,119(2) | 336,064 |
| Executive Vice President | 2015 | 280,000 | - | - | 36,562 | 316,562 |
| | 2014 | 241,538 | - | - | 18,447 | 259,985 |

(2)  All Other Compensation for fiscal 2016 consists of:

| Name and Principal Position | Automobile Expenses ($) | Simple IRA Contribution ($) | Total ($) |
|---|---|---|---|
| Eric S. Langan | 55,140 | 12,500 | 67,640 |
| Phillip K. Marshall | 18,548 | 7,490 | 26,038 |
| Travis Reese | 27,719 | 8,400 | 36,119 |

120.     The foregoing reporting of executive compensation was materially false and misleading because it did not reflect "all forms of compensation."  Specifically, Defendants omitted Defendant Langan's and Reese's perquisites, which must be reported in accordance with Item 402, thereby materially understating their executive compensation.  As only much later admitted by the Company, Defendant Langan's and Reese's personal use of the corporate aircraft, clearly a perquisite, was completely omitted from the Company's SEC filings for the fiscal year ended September 30, 2016.

121.     Defendants filed RCI's 2017 Proxy Statement with the SEC on August 10, 2017. Matters up for shareholder vote in the 2017 proxy and at RCI's annual shareholder meeting held on September 19, 2017, included the re-election of Defendant Langan and Reese as directors, a

non-binding advisory vote on executive compensation, and a non-binding vote on the frequency

of votes on executive compensation.  The 2017 Proxy Statement, which was signed by Langan,

stated in relevant part under "Perquisites and Other Personal Benefits," "[t]he ***Company does not***

***provide named executive officers with any significant perquisites or other personal benefits***

***except for an automobile for each executive's business use***."    Further, the 2017 proxy

misleadingly reported executive compensation as follows:

| Name and Principal Position | Year | Salary ($) | Stock Awards [1] ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Eric S. Langan | 2016 | 878,434 | - | - | 67,640(2) | 946,074 |
| *President and Chief Executive Officer* | 2015 | 832,143 | - | - | 67,505 | 899,648 |
| | 2014 | 856,731 | 592,180 | - | 97,680 | 1,546,591 |
| | | | | | | |
| Phillip K. Marshall | 2016 | 255,866 | - | - | 26,038(2) | 281,904 |
| *Chief Financial Officer* | 2015 | 251,442 | - | - | 25,734 | 277,176 |
| | 2014 | 246,538 | - | - | 29,070 | 275,608 |
| | | | | | | |
| Travis Reese | 2016 | 299,945 | - | - | 36,119(2) | 336,064 |
| *Executive Vice President* | 2015 | 280,000 | - | - | 36,562 | 316,562 |
| | 2014 | 241,538 | - | - | 18,447 | 259,985 |

(2)  All Other Compensation for fiscal 2016 consists of:

| Name and Principal Position | Automobile Expenses ($) | Simple IRA Contribution ($) | Total ($) |
|---|---|---|---|
| Eric S. Langan | 55,140 | 12,500 | 67,640 |
| Phillip K. Marshall | 18,548 | 7,490 | 26,038 |
| Travis Reese | 27,719 | 8,400 | 36,119 |

122.    Defendants' statement that "***the Company does not provide named executive***

***officers with any significant perquisites or other personal benefits except for an automobile***"

was materially false and misleading because RCI ***did*** provide its executive officers with

significant perquisites or other personal benefits beyond the use of an automobile.  Specifically,

Defendants omitted Defendant Langan's and Reese's significant perquisites in the form of

personal and recreational use of the Company aircraft.  As only much later admitted by the

Company, named executive officers ***did*** receive personal benefits outside of automobile use, as

Defendant Langan's and Reese's personal use of the corporate aircraft, clearly a perquisite, was completely omitted from the Company's 2017 Proxy Statement, despite its required disclosure under Item 402.

123.    On February 14, 2018, the Company filed its FY 2017 Form 10-K with the SEC. Regarding executive compensation, Defendants misleadingly reported that "*[t]he following table reflects all forms of compensation* for services to us for the fiscal years ended September 30, 2017, 2016 and 2015 of our named executive officers":

Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Stock Awards (1) ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Eric S. Langan | 2017 | 900,000 | - | - | 58,450 | 958,450 |
| *President and Chief Executive Officer* | 2016 | 878,434 | - | - | 67,640 | 946,074 |
| | 2015 | 832,143 | - | - | 67,505 | 899,648 |
| | | | | | | |
| Phillip K. Marshall | 2017 | 263,942 | - | - | 19,519 | 283,461 |
| *Chief Financial Officer* | 2016 | 255,866 | - | - | 26,038 | 281,904 |
| | 2015 | 251,442 | - | - | 25,734 | 277,176 |
| | | | | | | |
| Travis Reese | 2017 | 320,000 | - | - | 38,704 | 358,704 |
| *Executive Vice President* | 2016 | 299,945 | - | - | 36,119 | 336,064 |
| | 2015 | 280,000 | - | - | 36,562 | 316,562 |

(2)   All Other Compensation for fiscal 2017 consists of:

| Name and Principal Position | Automobile Expenses ($) | Simple IRA Contribution ($) | Total ($) |
|---|---|---|---|
| Eric S. Langan | 45,950 | 12,500 | 58,450 |
| Phillip K. Marshall | 11,601 | 7,918 | 19,519 |
| Travis Reese | 29,104 | 9,600 | 38,704 |

124.    The foregoing reporting of executive compensation was materially false and misleading because it did not reflect "all forms of compensation."  Specifically, Defendants omitted Defendant Langan's and Reese's perquisites, which must be reported in accordance with Item 402, thereby understating executive compensation.  As only much later admitted by the

Company, Defendant Langan's and Reese's personal use of the corporate aircraft, clearly a perquisite, was completely omitted from the Company's FY 2017 Form 10-K.

125.    On December 31, 2018, the Company filed its FY 2018 Form 10-K with the SEC, regarding executive compensation, Defendants reported:

Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Stock Awards (1) ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Eric S. Langan *President and Chief Executive Officer* | 2018 | 1,015,384 | - | - | 44,887 | 1,060,271 |
| | 2017 | 900,000 | - | - | 58,450 | 958,450 |
| | 2016 | 878,434 | - | - | 67,640 | 946,074 |
| Phillip K. Marshall *Chief Financial Officer* | 2018 | 294,231 | - | - | 17,358 | 311,589 |
| | 2017 | 263,942 | - | - | 19,519 | 283,461 |
| | 2016 | 255,866 | - | - | 26,038 | 281,904 |
| Travis Reese *Executive Vice President* | 2018 | 346,854 | - | - | 41,352 | 388,206 |
| | 2017 | 320,000 | - | - | 38,704 | 358,704 |
| | 2016 | 299,945 | - | - | 36,119 | 336,064 |

(2)  All Other Compensation for fiscal 2018 consists of the following: (a) for Mr. Langan, SIMPLE IRA matching contributions of $14,394 and personal use of aircraft amounting to $30,493; (b) for Mr. Marshall, SIMPLE IRA matching contributions of $8,834 and automobile expenses of $8,524; and (c) for Mr. Reese, SIMPLE IRA matching contributions of $10,408, automobile expenses of $25,409, and personal use of aircraft amounting to $5,535. Personal use of aircraft is based on hourly flight charges and other variable charges.

126.    The foregoing reporting of executive compensation was materially false and misleading because it continued to under-report compensation derived from Langan's and Reese's personal use of the Company jet.  As only later admitted by the Company, Defendants understated Defendant Langan's compensation by approximately 69%, and Reese's compensation by nearly 73% due to their personal use of the corporate jet.

**C.    Defendants' Materially False and/or Misleading Statements Regarding RCI's Internal Controls**

127.    On December 13, 2016, the Company filed its FY 2016 Form 10-K with the SEC.

In the FY 2016 Form 10-K under Item 9A, Controls and Procedures, the Company misleadingly stated:

> Management assessed the effectiveness of our internal control over financial reporting as of September 30, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in "Internal Control—Integrated Framework (2013)." Based on this assessment, we believe that, as of September 30, 2016, **our internal control over financial reporting was effective based on those criteria.** Our internal control over financial reporting as of September 30, 2016, has been audited by Whitley Penn LLP, an independent registered public accounting firm, as stated in their report which is included herein.

128.    Defendants Langan and Marshall, through their SOX certifications attached as Exhibit 31-1 and Exhibit 31-2 to the FY 2016 Form 10-K, also misleadingly certified:

> 1.    I have reviewed this annual report on Form 10-K of RCI Hospitality Holdings, Inc.;

> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b)    **Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under my supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles**;

(c)     *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and*

(d)     *Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal year that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting*; and

5.     *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's independent registered public accounting firm and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):*

(a)     *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

(b)     *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

129.     The statements identified in ¶¶ 127-28 above were materially false and misleading because, in fact, RCI suffered from numerous material weaknesses in the Company's internal controls over financial reporting for the FY 2016.  As a result of these material weaknesses, Defendants misreported and/or failed to disclose certain material related party transactions, materially under-reported executive compensation, and omitted required director disclosure of bankruptcies in RCI's FY 2016 Form 10-K.

130.     Defendants Langan and Marshall signed SOX certifications that were submitted with RCI's Form 10-Q filed with the SEC on February 9, 2017, its Form 10-Q filed with the SEC on May 9, 2017, and its Form 10-Q filed with the SEC on August 9, 2017.  The content of the 10-Q SOX certifications was substantively identical to the SOX certification quoted in ¶ 128, and was misleading because, in fact, RCI suffered from numerous material weaknesses in the

Company's internal controls over financial reporting into FY 2017, and as a result, Defendants misreported and/or failed to disclose certain material related party transactions, materially under-reported executive compensation, and omitted required director disclosure of bankruptcies.

131.    On March 29, 2017, Defendants attended the Sidoti & Company Spring 2017 Emerging Growth Convention, during which Defendant Langan misleadingly assured investors that RCI had "developed sophisticated systems for management, cash handling, purchasing and other best practices."

132.    The above statement is materially false and/or misleading because, in fact, RCI suffered from numerous material weaknesses in the Company's internal controls over financial reporting at that time.   Defendants failed to disclose these material weaknesses in RCI's quarterly reporting for the period ending March 31, 2017, which was filed with the SEC on May 9, 2017.

133.    On February 14, 2018, the Company filed its FY 2017 Form 10-K with the SEC. In the FY 2017 Form 10-K under Item 9A, Controls and Procedures, the Company stated in relevant part:

> In accordance with Rule 13a-15(b) of the Exchange Act, as of the end of the period covered by this Annual Report on Form 10-K, management evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act). Based on their evaluation of these disclosure controls and procedures, they have concluded that our disclosure controls and procedures were not effective as of September 30, 2017. This determination is based on the material weaknesses management identified in our internal control over financial reporting, as described below. We are in the process of remediating the material weaknesses, as described below, which should remedy our disclosure controls and procedures, but we will continue to monitor this issue.
>
> Control Activities
>
> • Complex Accounting and Management Estimates –We did not appropriately design or maintain effective controls over complex accounting and management estimates related to assets held for sale, business combinations, cost method investments, income taxes, and the

impairment analyses for indefinite lived intangible assets, goodwill, and property and equipment which resulted in certain instances of incorrect accounting and improper valuation decisions.

- Financial Statement Preparation and Review –We did not design or maintain effective controls to support accurate accounting, reporting, and disclosures within our Form 10-K.

- Information Technology and Segregation of Duties - We did not design or maintain effective controls to prevent unauthorized access to certain systems, programs and data, and provide for periodic review and monitoring of access including review of security logs and analysis of segregation of duties conflicts. Furthermore, a number of individuals had access to record journal entries but there is no procedure in place to ensure that all journal entries recorded are reviewed.

\*\*\*

We have taken, and continue to take, the actions described below to remediate the identified material weaknesses. As we continue to evaluate and work to improve our internal controls over financial reporting, our senior management may determine to take additional measures to address control deficiencies or determine to modify the remediation efforts described in this section.

\*\*\*

*Strengthening internal controls over complex accounting and management estimates* – Subsequent to September 30, 2017, we have committed to resolve the controls over complex accounting and estimates and prevent instances of incorrect accounting and improper valuation decisions, by hiring valuation experts to assist us with our goodwill, indefinite-lived intangible assets, and property and equipment impairment analyses whenever necessary and with the analysis and accounting for business combinations, income taxes, and other complex accounting matters.

***Strengthening internal controls over financial reporting and disclosures* -** We believe the new Enterprise Resource Planning ("ERP") system described below will assist us in strengthening the controls over financial reporting, and **we are committed to also add an overlay of review of our financial statements during our financial reporting process.  We have also upgraded our accounting staff with certain newly hired accountants.**

We have also committed to hiring an outsourced internal audit group to assist with the controls over these processes and other internal control functions.

With the oversight of our Board of Directors and Audit Committee, the Company has also begun taking steps and plans to take additional measures to remediate the underlying causes of the material weaknesses.

*Strengthening the information technology application and related segregation of duties issues* – We were previously aware of the limitations of our accounting software and had been in the planning/implementation process of replacing the software for many months prior to September 30, 2017. In October 2017, we completed the conversion to a new ERP system which, along with changes to our

manual internal controls, we believe will resolve the issues detailed above relating to the information systems and segregation of duties. The new ERP system has features that prevent unauthorized access to certain programs and data, and provides for periodic review and monitoring of access including review of security logs and analysis of segregation of duties conflicts. These features include proper segregation of duties within our journal entry process. We have also hired a Director of ERP & Business Intelligence.

134.   The forgoing statements about RCI's internal controls and Defendants' remedial measures to correct the weaknesses were materially false and/or misleading because: (1) Defendants suggested that the internal control weaknesses arose only as of September 30, 2017, when, in fact, they had existed during FY 2016, thereby misleadingly downplaying the nature and extent of the deficiencies; (2) Defendants failed to disclose the existence of separate and ongoing material weaknesses in the Company's internal controls—namely, the weakness related to reporting related party transactions and; (3) despite Defendants' assurances of strong remedial measures, throughout the remainder of the Class Period, Defendants continued to exploit existing material weaknesses and failed to disclose related party transactions and executive compensation in the form of significant perquisites.

135.   Defendants Langan and Marshall signed SOX certifications that were submitted with the Company's FY 2017 Form 10-K.  The content of the certifications was substantively identical to the certification quoted in ¶ 128, and was materially false and/or misleading because: (1) Defendants failed to disclose the existence of separate and ongoing material weaknesses in the Company's internal controls—namely, the weakness related to reporting related party transactions and; (2) despite Defendants' assurances of strong remedial measures, throughout the remainder of the Class Period, Defendants continued to exploit existing material weaknesses and failed to disclose related party transactions and executive compensation in the form of significant perquisites.

136.   Defendants Langan and Marshall signed SOX certifications that were submitted with the 10-Q filed with the SEC on March 7, 2018; the 10-Q filed with the SEC on May 10,

2018; and the 10-Q filed with the SEC on August 9, 2018.  The content of the 10-Q SOX certifications was substantively identical to the SOX certification quoted in ¶ 128, and was materially false and/or misleading because: (1) Defendants failed to disclose the existence of separate and ongoing material weaknesses in the Company's internal controls—namely, the weakness related to reporting related party transactions and; (2) despite Defendants' assurances of strong remedial measures, throughout the remainder of the Class Period, Defendants continued to exploit existing material weaknesses and failed to disclose related party transactions and executive compensation in the form of significant perquisites.

137.    On December 31, 2018, the Company filed its FY 2018 Form 10-K with the SEC. In the FY 2018 Form 10-K, under Item 9A, Controls and Procedures, the Company stated, in relevant part:

> In accordance with Rule 13a-15(b) of the Exchange Act, as of the end of the period covered by this Annual Report on Form 10-K, management evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act). Based on their evaluation of these disclosure controls and procedures, they have concluded that our disclosure controls and procedures were not effective as of September 30, 2018. This determination is based on the material weaknesses management identified in our internal control over financial reporting, as described below. We are in the process of remediating the material weaknesses, as described below, which should remedy our disclosure controls and procedures, but we will continue to monitor this issue.
>
> ***
>
> Control Activities
>
> • Revenues –We did not properly design or maintain effective controls over the segregation of cash counts at our nightclubs and restaurants, the information produced by our point-of-sale systems, other revenues generated outside the point-of-sale system, and the review of journal entries used to record revenue transactions.
>
> • Complex Accounting and Management Estimates –We did not properly design or maintain effective controls over complex accounting and management estimates related to the impairment analyses for indefinite lived intangible assets, goodwill, and property and equipment, and the accounting for income taxes, assets held for sale, business combinations,

debt modifications, and useful lives of leasehold improvements, which resulted in certain instances of incorrect accounting and improper valuation decisions.

- Financial Statement Close and Reporting –We did not properly design or maintain effective controls, in aggregate, over the period end financial close and reporting process to enable timely reporting of complete and accurate financial information.  Specifically, we lacked controls to define financial statement review thresholds, consistently perform independent reviews of journal entries prior to posting, and consistently prepare, approve, and retain adequate supporting documentation for financial statement balances and the related footnote disclosures.

- Information Technology –We did not properly design or maintain effective controls to prevent unauthorized access to certain systems, programs and data, and provide for periodic review and monitoring of access and changes in programs, including review of security logs and analysis of segregation of duties conflicts.

- Segregation of Duties –We did not maintain effective policies, procedures, or controls in aggregate to ensure adequate segregation of duties within the Company's business processes, financial applications, and IT systems. Specifically, we did not have appropriate controls in place to adequately assess the segregation of job responsibilities and system user access for initiating, authorizing, and recording transactions.

\*\*\*

We have taken, and continue to take, the actions described below to remediate the identified material weaknesses. As we continue to evaluate and work to improve our internal controls over financial reporting, our senior management may determine to take additional measures to address control deficiencies or determine to modify the remediation efforts described in this section.

\*\*\*

Strengthening internal controls over financial statement close and reporting –With the oversight of our Audit Committee, we have continued to take proactive steps and implement additional measures to remediate the underlying causes of the material weaknesses. We are taking significant steps to improve our risk assessment process and monitoring structure, as follows:

- The new ERP system described below has and will continue to assist us in strengthening the controls over financial reporting, and we have also added an overlay of review of our financial statements during our financial reporting process.

- On top of the ERP system described above, we have also implemented, in April 2018, a new monitoring and security software to automate our segregation of duties as well as access monitoring controls and generate compliance documentation. The effective implementation of this software remains in process as we evaluate both manual and automated controls impacted by segregation of duties.

- We have upgraded our accounting staff with certain newly hired accountants.
- We have retained a more robust outside consulting firm to assist us in evaluating, redesigning and implementing necessary steps to maintain adequate internal controls. As this work did not begin until May 2018, we expect to have a much improved control structure with their assistance for an entire fiscal year in 2019.
- We will develop proper controls to evaluate monthly and quarterly financial statement variances.
- We will develop proper controls over the review and evaluation of financial statement balances and the related footnote disclosures.
- We will consider certain enhanced journal review procedures which will ensure that proper review can be executed and evidenced.

138.    The foregoing statements about RCI's internal controls and Defendants' remedial measures to correct the weaknesses were materially false and/or misleading because: (1) Defendants failed to disclose the existence of separate and ongoing material weaknesses in the Company's internal controls—namely, the weakness related to reporting related party transactions and; (2) despite Defendants' assurances of strong remedial measures, throughout the remainder of the Class Period, Defendants continued to exploit existing material weaknesses and failed to disclose related party transactions and executive compensation in the form of significant perquisites.

139.    In the Q4 2018 Earnings Call held the same day, Defendants misleadingly attempted to allay any concern regarding the continued existence of ineffective internal controls. Douglas Weiss of Sidoti & Company, LLC questioned CEO Langan: "***BDO had some comments in the last K, and you guys sort of published what you're doing in the—from a remediation standpoint.  And then they seemed to have a similar comments in this K***.  So I guess my question is just, are you working with them so that, that this – that those issues are resolved this year?"  Defendant Langan misleadingly assured the market that Defendants "hired a third party internal auditing company, a controls company to came in and helped us write a lot

of controls.  We bought some additional what they call SOD, Segregation of Duties software, that was installed and put it in May….*we've been working on this throughout the year in order to get a clean bill of health on these internal control requirements*."

140.    The foregoing statements about Defendants' assurances that remedial measures were being implemented to correct the partially disclosed weaknesses in RCI's internal controls were materially false and/or misleading because despite Defendants' assurances, throughout the remainder of the Class Period, Defendants continued to exploit existing material weaknesses and failed to disclose related party transactions and executive compensation in the form of significant perquisites.

141.    Defendants Langan and Marshall signed SOX certifications that were submitted with the Company's FY 2018 Form 10-K.  The content of the certifications was substantively identical to the certification quoted in ¶ 128, and was materially false and/or misleading because: (1) Defendants failed to disclose the existence of separate and ongoing material weaknesses in the Company's internal controls—namely, the weakness related to reporting related party transactions and; (2) despite Defendants' assurances of strong remedial measures, throughout the remainder of the Class Period, Defendants continued to exploit existing material weaknesses and failed to disclose related party transactions and executive compensation in the form of significant perquisites.

### D.    Defendants' Misleading Director Biography Descriptions

142.    On December 13, 2016, the Company filed its annual report on Form 10-K with the SEC for the period ending September 30, 2016. Included in the 2016 10-K was Steven Jenkins's biography as follows: "Steven L. Jenkins has been a Director since June 2001. Since 1988, Mr. Jenkins has been a certified public accountant with Pringle Jenkins & Associates, P.C., located in Houston, Texas. Mr. Jenkins is the President and owner of Pringle Jenkins &

Associates, P.C. Mr. Jenkins has a BBA Degree (1979) from Texas A&M University. Mr. Jenkins is a member of the AICPA and the TSCPA. Mr. Jenkins' impressive accounting background makes him a valuable asset to the Board and the Audit Committee."

143.    This statement was misleading because it omitted information required by Item 401 of Regulation S-K, in that it failed to disclose Jenkins' chapter 13 bankruptcies in 2010 and 2015.

144.    Defendants filed RCI's Definitive Proxy Statement on Schedule 14A for the 2017 Annual Meeting of Stockholders with the SEC on August 10, 2017.  Matters up for shareholder vote in the 2017 proxy and at RCI's annual shareholder meeting held on September 19, 2017, included the re-election of Jenkins as director.  In the 2017 proxy, Defendants stated, "Steven L. Jenkins, age 60, has been a Director since June 2001. Since 1988, Mr. Jenkins has been a certified public accountant with Pringle Jenkins & Associates, P.C., located in Houston, Texas. Mr. Jenkins is the President and owner of Pringle Jenkins & Associates, P.C. Mr. Jenkins has a BBA Degree (1979) from Texas A&M University. Mr. Jenkins is a member of the AICPA and the TSCPA. Mr. Jenkins' impressive accounting background makes him a valuable asset to the Board and the Audit Committee."

145.    Defendants' statement was false and misleading because it omitted information required by Item 401 of Regulation S-K, in that it failed to disclose Jenkins' chapter 13 bankruptcies in 2010 and 2015.

146.    On February 14, 2018, the Company filed its annual report on Form 10-K with the SEC for the period ended September 30, 2017.  Included in the 2017 10-K was Jenkins's biography as follows: "Steven L. Jenkins has been a Director since June 2001. Since 1988, Mr. Jenkins has been a certified public accountant with Pringle Jenkins & Associates, P.C., located in Houston, Texas. Mr. Jenkins is the President and owner of Pringle Jenkins & Associates, P.C.

Mr. Jenkins has a BBA Degree (1979) from Texas A&M University. Mr. Jenkins is a member of the AICPA and the TSCPA. Mr. Jenkins' impressive accounting background makes him a valuable asset to the Board and the Audit Committee."

147.    This statement was misleading because it omitted information required by Item 401 of Regulation S-K, in that it failed to disclose Jenkins's chapter 13 bankruptcies in 2010 and 2015.

148.    On December 31, 2018, the Company filed its annual report on Form 10-K with the SEC for the period ended September 30, 2018.  Included in the 2018 10-K was Steven Jenkins's biography as follows: "Steven L. Jenkins has been a Director since June 2001. Since 1988, Mr. Jenkins has been a certified public accountant with Pringle Jenkins & Associates, P.C., located in Houston, Texas. Mr. Jenkins is the President and owner of Pringle Jenkins & Associates, P.C. Mr. Jenkins has a BBA Degree (1979) from Texas A&M University. Mr. Jenkins is a member of the AICPA and the TSCPA. Mr. Jenkins' impressive accounting background makes him a valuable asset to the Board and the Audit Committee."

149.    This statement was false and misleading because it failed to disclose Jenkins's Chapter 13 bankruptcies in 2010 and 2015, as required by Item 401.

## VI.    ADDITIONAL ALLEGATIONS REGARDING DEFENDANTS' SCIENTER

150.    As alleged herein, Defendants acted with scienter because Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding RCI, their control over,

and/or receipt and/or modification of RCI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning RCI, participated in the fraudulent scheme alleged herein.

151.    Throughout the Class Period, Defendants Langan, Marshall, in their respective capacities as CEO, CFO and Defendants Jenkins and Nour-Dean Anakar, both as Directors and members of the Audit, Nominating, and Compensation Committees, played a significant role in preparing and ensuring the accuracy of RCI's annual and quarterly reports and proxy statements filed with the SEC.

152.    During the Class Period, the Audit Committee was comprised of Yura Barabash, and Defendants Steven Jenkins and Nour-Dean Anakar, all supposed independent Directors. According to RCI, the Audit Committee's primary purpose was "to oversee the Company's financial reporting process on behalf of the Board of Directors."  To accomplish this, the Audit Committee is required to meet privately with the Company's CFO and RCI's independent registered public accounting firm to evaluate the factual responses provided by the CFO and the judgments made by RCI's outside independent registered public accounting firm.  Additionally, the Audit Committee is also charged with conducting an ongoing review of RCI's financial reports and other financial information prior to filing with the SEC.  The Audit Committee also must review RCI's systems, methods and procedures of internal controls in the areas of: financial reporting, audits, treasury operations, corporate finance, managerial, financial and SEC accounting, compliance with law, and ethical conduct.

153.    During the Class Period, the Compensation Committee was comprised of Luke Lirot, and Yura Barabash, and Defendants Steven Jenkins and Nour-Dean Anakar.  According to RCI, the Compensation Committee's primary purpose is to evaluate and review the compensation of the Company's executive officers.

154.    During the Class Period, the Nominating Committee was comprised of Luke

Lirot, and Yura Barabash, and Defendants Steven Jenkins and Nour-Dean Anakar.  According to

RCI, the Nominating Committee's purpose it to identify, review, and evaluate potential RCI

directors.

### A.    Defendants Closely Reviewed RCI's Financial Reports And Were Aware Of Unreported Personal Use Of The Corporate Jet & Related Party Transactions

155.    Defendants Langan and Marshall, in their respective capacities as CEO and CFO,

and Defendants Jenkins and Nour-Dean Anakar, both as Directors and members of the Audit

Committee, were chiefly responsible for the monitoring and reporting of the Company's

operating and general and administrative expenses, which include executive compensation.

Defendants Langan and Marshall had clear visibility into the Company's operating costs, which

included the unreported or underreported perquisites, as compensation, from personal use of the

corporate aircraft during the Class Period.  Defendant Langan undoubtedly knew (as he had

personally used the Company-owned aircraft) that the Company's 10-Ks and proxy statements

relating to executive compensation contained false and misleading information regarding the

nature and amount of Langan's and Reese's compensation.  Defendant Marshall was, at

minimum, severely reckless in signing and certifying that the Company's 10-Ks and proxy

statements containing false and misleading information regarding the nature and amount of

Langan's and Reese's compensation.  As members of the Audit Committee, Defendants Jenkins

and Nour-Dean Anakar were charged with evaluating the Company's factual responses which

are included in RCI's annual and quarterly financial reports, as well as reviewing those reports

prior to filing with the SEC.

156.    In addition, Defendants Langan's, Marshall's, Nour-Dean Anakar's, and Jenkins'

positions gave them insight into the unreported related party transactions.  Defendant Marshall

has an extensive background in financial reporting and auditing procedures, as he was an auditing partner at KPMG prior to working for RCI.  Throughout the Class Period, Defendant Langan unquestionably knew that RCI paid sums over $120,000 to his father's and brother's companies for construction and maintenance work on the Company's Bombshells restaurants but intentionally or recklessly failed to disclose this required information.  Defendant Jenkins, as a member of the Audit Committee and its designated "financial expert" was charged with reviewing related party transactions and knew that he had filed for multiple bankruptcies but intentionally or recklessly failed to disclose this information to be included in the Company's public statements.  Defendant Nour-Dean Anakar, as a member of the Audit Committee was charged with reviewing related party transactions, knew his brother was employed at the Company but intentionally or recklessly failed to disclose Ed Anakar's salary as a related party transaction.  Defendant Marshall was, at minimum, severely reckless in signing and certifying that the Company's 10-Ks, 10-Qs, and/or proxy statements containing false and misleading information regarding the Company's related party transactions.

**B.    Defendants' SOX Certifications Further Demonstrate That They Acted With The Requisite Level Of Scienter**

157.    In conjunction with RCI's public financial statements filed with the SEC during the Class Period, Defendants Langan and Marshall issued certifications pursuant to § 302 of SOX, attesting that they reviewed the contents of the filings to confirm that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [RCI] as of, and for, the periods presented in this report."

158.    To assure each certification was not simply a hollow gesture, Defendants Langan

and Marshall were required to and did further confirm that they were responsible for "design[ing] such disclosure controls and procedures, or caus[ing] such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [RCI] . . . is made known to us . . . ."  Langan and Marshall acknowledged that they had designed such controls to assure "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Langan and Marshall further certified that they had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," as well as "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the [RCI's] internal control over financial reporting."

159.    Despite Defendants Langan's and Marshall's SOX certifications, and their specific assurances concerning RCI's internal controls and remedial measures, which conveyed that all known accounting issues had been disclosed and were being remediated, Langan and Marshall knowingly concealed the existence of, *inter alia*, additional and unresolved material weaknesses during the Class Period, which Langan exploited for his own personal gain, all under Marshall's eye.

## C.     BDO's Resignation In Connection With The Internal Review Raises A Strong Inference Of Scienter

160.    On May 10, 2019, the Company announced that the SEC initiated an informal inquiry into the Company's operations.  In connection with these events, RCI charged a special committee of the Audit Committee to engage an independent outside counsel to conduct an internal review.

161.    On July 18, 2019, BDO resigned because it believed that the internal review was deficient and was thwarted by Defendants.  Specifically, BDO stated that it "believes the

company has not performed sufficient investigatory procedures and has not taken timely and appropriate remedial action in response to certain deficiencies that BDO thinks exist in the way the internal review has been conducted, including: (*i*) *undue restriction on the scope of the internal review; (ii) failure to initiate certain forensic procedures; (iii) refusal to provide BDO access to pertinent interview summaries and other documents; (iv) lack of assessment as to the impact of the matters identified to date on existing and future regulatory filings, including financial statements related footnotes; and (v) restrictions, based on privilege, hindering BDO's ability to properly shadow and evaluate the adequacy of the internal review*."

162.     The fact that BDO resigned as independent accountants, as BDO concluded that it could not rely on RCI's senior management and Special Committee to provide accurate information, strongly supports an inference of scienter.

163.     In addition, RCI's new independent auditor expressed an adverse opinion regarding RCI's internal controls for FY 2019 following the finalization of the Special Committee's findings and internal review.

### D.     Defendants' Fraudulent Concealment Allowed Them To Artificially Prop Up RCI's Stock Price

164.     Defendants violated GAAP, NASDAQ, SEC Rules, and RCI's own internal policies, and made false and misleading statements about Langan and Reese's executive compensation, related party transactions, and disclosures regarding board members, and the quality and effectiveness of RCI's internal controls, to avoid the decline in the Company's stock price.  Defendants were motivated to conceal material adverse facts about the Company.

### E.     There Is A Strong Inference RCI Acted With The Requisite Scienter

165.     Each of the Individual Defendants was a high-ranking management-level employee.  The scienter of each of the Individual Defendants and of all other management-level employees of RCI, including each high-ranking officer or director, is imputable to the Company.

The knowledge of each of these individuals should therefore be imputed to RCI for the purposes of assessing corporate scienter.

166.    Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to RCI as an entity.  Corporate scienter may be alleged independent of individual defendants where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading.  Here, the statements alleged were made to the investing public regarding the Company's operations, internal controls, finances and business practices—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to investors.

167.    These statements intentionally omitted required disclosures regarding members of the Company's Board of Directors from RCI's annual and quarterly reports and proxy statements filed with the SEC during the Class Period.  RCI failed to disclose material information related to two of its independent directors and two of its top executives.  First, RCI did not disclose that Defendant Jenkins had filed for personal bankruptcy twice during his tenure on the Board of Directors as required by Item 401.  Second, RCI did not disclose that Defendant Nour-Dean Anakar's brother, Ed Anakar, is employed by RCI and is paid a substantial salary, or that Defendant Langan's family was enriched by related party transactions as required by Item 404.  And lastly, RCI failed to disclose the totality of Langan's and Reese's executive compensation as required by Item 402.

168.    Additionally, Defendant Jenkins's resignation following the Company's disclosure of his personal bankruptcies contributes to a strong inference of scienter.

## VII.    CLASS ACTION ALLEGATIONS

169.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired RCI securities between December 13, 2016 and July 18, 2019, inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

170.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, RCI's common stock actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by RCI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

171.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

172.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

173.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of RCI; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

174.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.   APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

175.    The market for RCI's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, RCI's securities traded at artificially inflated prices during the Class Period.  On July 26, 2018, the Company's share price closed at a Class Period high of $34.37 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of RCI's securities and market information relating to RCI, and have been damaged thereby.

176.     At all relevant times, the market for RCI's securities was an efficient market for the following reasons, among others:

a.      RCI shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.      As a regulated issuer, RCI filed periodic public reports with the SEC and/or the

NASDAQ;

c.    RCI regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.    RCI was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and/or

e.    RCI had a market capitalization reaching over $334 million during the Class Period.

177.    As a result of the foregoing, the market for RCI's securities promptly digested current information regarding RCI from all publicly available sources and reflected such information in RCI's share price. Under these circumstances, all purchasers of RCI's securities during the Class Period suffered similar injury through their purchase of RCI's securities at artificially inflated prices and a presumption of reliance applies.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE*

178.    During the Class Period, the artificial inflation of RCI's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about RCI's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of RCI and its

business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result

179.    A Class-wide presumption of reliance is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    LOSS CAUSATION

180.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of RCI's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about RCI's business, operations, and prospects as alleged herein.

181.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  During the Class Period, Plaintiffs and

the Class purchased RCI's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

182.    The truth regarding RCI's internal controls and/or executive misconduct was partially revealed, and/or the concealed risks materialized, on or about May 10, 2019 and July 18, 2019.  As a direct result of certain of these partial disclosures, the price of RCI's stock declined precipitously.

183.    The damage suffered by Plaintiffs and other members of the Class was a direct result of Defendants' practice of issuing false and misleading information and withholding material information from RCI investors, and the subsequent significant decline in the value of RCI securities when the truth was revealed.  During the Class Period, investors were focused on the integrity of RCI's internal controls and financial reporting.

184.    On May 10, 2019, the Company filed a Form 12b-25 with the SEC stating it could not timely file its quarterly report due to pending investigations.  The Company stated, in relevant part:

> In mid- and late 2018, a series of negative articles about the registrant was anonymously published in forums associated with the short-selling community. Subsequently in 2019, the SEC initiated an informal inquiry. In connection with these events, a special committee of the registrant's Audit Committee engaged independent outside counsel to conduct an internal review. The registrant and its management are cooperating with both the internal review and the SEC inquiry. Because the internal review is still ongoing, the registrant will be delayed in filing its Form 10-Q.

86.    On this news, the Company's share price fell $1.67, or over 7%, to close at $20.48 per share on May 13, 2019, on unusually heavy trading volume.

185.    On July 18, 2019, after the market closed, the Company revealed that BDO resigned as RCI's auditor because it disagreed with procedural aspects of the review process and

remedial measures.  Per RCI's July 18, 2019 Form 8-K:

> Specifically, BDO stated that it believes the company has not performed sufficient investigatory procedures and has not taken timely and appropriate remedial action in response to certain deficiencies that BDO thinks exist in the way the internal review has been conducted, including: (i) undue restriction on the scope of the internal review; (ii) failure to initiate certain forensic procedures; (iii) refusal to provide BDO access to pertinent interview summaries and other documents; (iv) lack of assessment as to the impact of the matters identified to date on existing and future regulatory filings, including financial statements related footnotes; and (v) restrictions, based on privilege, hindering BDO's ability to properly shadow and evaluate the adequacy of the internal review.

186.   On this news, the Company's share price fell $2.18, or 12.95%, to close at $14.65 per share on July 19, 2019, on unusually heavy trading volume.

## XI.   CAUSES OF ACTION

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against Defendants RCI, Langan, and Marshall

187.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

188.   This Count is asserted against Defendants RCI, Langan, and Marshall and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

189.   During the Class Period, Defendants RCI, Langan, and Marshall, individually and in concert, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase RCI's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants RCI, Langan, and Marshall, individually and in concert, directly or indirectly, took the actions set forth herein.

190.   Defendants RCI, Langan, and Marshall violated §10(b) of the 1934 Act and Rule

10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.  Defendants RCI, Langan, and Marshall are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

191.   Defendants RCI, Langan, and Marshall acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

192.   Individual Defendants Langan's and Marshall's primary liability and controlling person liability arises from the following facts: (i) Individual Defendants Langan and Marshall were a high-level executive and/or director at the Company during the Class Period and member of the Company's management team or had control thereof; (ii) Individual Defendants Langan and Marshall by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the

Company's internal budgets, plans, projections and/or reports; (iii) Individual Defendants Langan and Marshall enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Individual Defendants Langan and Marshall were aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

193.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of RCI's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants RCI, Langan, and Marshall, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants RCI, Langan, and Marshall, but not disclosed in public statements by Defendants RCI, Langan, and Marshall during the Class Period, Plaintiffs and the other members of the Class acquired RCI's securities during the Class Period at artificially high prices and were damaged thereby.

194.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

195.    As a direct and proximate result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class suffered damages in an amount to be established at trial.

196.    By reason of the foregoing, Defendants RCI, Langan, and Marshall violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

197.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

198.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

199.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

200.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

201.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the  same  to  cause, the Company to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

202.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

(b)    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

(c)    Awarding Plaintiffs and other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

(d)    Awarding such other and further relief as the Court may deem just and proper.

## XIII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 24, 2020          GLANCY PRONGAY & MURRAY LLP

*/s/ Kara M. Wolke*

Kara M. Wolke (*pro hac vice* and Attorney-in Charge)
Melissa C. Wright (*pro hac vice*)
Jennifer M. Leinbach (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email: info@glancylaw.com

THE ROSEN LAW FIRM, P.A.
Phillip Kim (*pro hac vice*)
Brian B. Alexander (*pro hac vice*)
275 Madison Ave
40th Flr
New York, NY 10016
212-686-1060
Email: balexander@rosenlegal.com

*Lead Counsel for Lead Plaintiffs and the Class*

KENDALL LAW GROUP, PLLC
Joe Kendall
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
3232 McKinney Ave., Suite 700
Dallas, Texas 75204
Telephone: (214) 744-3000
Facsimile: (214) 744-3015

*Liaison Counsel for Lead Plaintiffs and the Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2020, I electronically filed a true and correct copy the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.


*/s/ Kara M. Wolke*
Kara M. Wolke