# EXHIBIT A

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 89935 / September 21, 2020

**ADMINISTRATIVE PROCEEDING**
File No. 3-20035

| | |
|---|---|
| **In the Matter of**<br><br> **RCI HOSPITALITY HOLDINGS, INC., ERIC S. LANGAN, AND PHILLIP K. MARSHALL, CPA**<br><br> **Respondents.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against RCI Hospitality Holdings, Inc., ("RCI"), Eric S. Langan ("Langan"), and Phillip K. Marshall ("Marshall") (collectively, "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

**Summary**

1.      These proceedings arise from RCI's disclosure and controls failures concerning executive compensation and related party transactions.  From fiscal year ("FY") 2014 through FY 2019, RCI failed to disclose a total of $615,000 in executive compensation in the form of perquisites.  These undisclosed perquisites included the cost of the personal use of the company's aircraft and company provided vehicles, reimbursement for personal commercial airline flights, the company's charitable contributions to the school two of Langan's children attended, and the cost of providing housing and a meals allowance to Marshall.  In addition, RCI failed to disclose related party transactions involving Langan's father and brother and a director's brother.  RCI also failed to keep accurate books and records, and lacked sufficient internal accounting controls concerning, these executive perquisites and related party transactions.  Chief Executive Officer ("CEO") Langan committed and he and Chief Financial Officer ("CFO") Marshall caused these violations.

**Respondents**

2.      RCI is a holding company incorporated in Texas with its principal place of business in Houston.  RCI's securities are registered under Section 12(b) of the Exchange Act and its securities trade on Nasdaq.  As of June 30, 2020, RCI, which has been a publicly listed company since 1995, operates thirty-eight (38) live-adult entertainment clubs and ten (10) military-themed Bombshells restaurants through its subsidiaries.  RCI also operates a small media group serving the adult-nightclub industry.

3.      Eric S. Langan, age 52, is a resident of Bellaire, Texas.  He has been RCI's president, CEO, and Chairman since 1999, and has been a company director since 1998.

4.      Phillip K. Marshall, age 70, is a resident of Garland, Texas.  He has been RCI's CFO since 2007.  He is also a certified public accountant licensed in Texas since 1974.

**FACTS**

5.      In accordance with Item 402 of Regulation S-K[2], Form 10-K and Schedule 14A require public companies to provide detailed disclosures of compensation they pay to "named executive officers" ("NEO"), which includes CEOs, CFOs, and a registrant's three most highly

---

[1]      The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2]      Unless otherwise indicated, references to any "Item" are to those in Regulation S-K.

compensated executive officers, other than the CEO and CFO. In this case, the NEOs are Langan, Marshall, and an executive vice president and a board member ("EVP").

6.       Each year, RCI solicits proxies for the selection of its board of directors.  Annually, Langan, among others, was listed as an RCI board member and a director nominee in the company's definitive proxy statements.

### A.       Undisclosed Executive Officer Perquisites

7.       During the relevant period, RCI told investors it did not provide its NEOs with significant perquisites.  Starting with its 2010 Form 10-K and 2011 Schedule 14A filings and through its 2018 filing, RCI's standard disclosure stated, "The Company does not provide named executive officers with any significant perquisites or other personal benefits except for an auto for each executive's business use."[3]

8.       Despite this disclosure, RCI, in fact, provided its NEOs with significant perquisites and personal benefits, as detailed below.  From FY 2014 through FY 2019, the total amounts of the undisclosed perquisites is as follows:

| Officer | Years | Undisclosed Amt. | % Undisclosed vs. Disclosed Perquisites |
|---|---|---|---|
| Langan | 2014 - 2019 | $497,232 | 120% |
| Marshall | 2017 - 2019 | $48,168 | 68% |
| EVP | 2016 - 2018 | $69,531 | 60% |

9.       Item 402 requires the disclosure of the total value of all perquisites and other personal benefits ("perquisites and benefits") provided to NEOs who receive at least $10,000 worth of such items in a given year.  When a NEO's perquisites and benefits amount exceeds the $10,000 threshold, as is the case here, Item 402 also requires disclosure of all perquisites and benefits by type, with specific quantification and disclosure by footnote of any perquisite or benefit that exceeds the greater of $25,000 or 10% of the total perquisites and benefits in a given year.

10.       Item 402 does not define perquisites and personal benefits. However, the Commission has explained, "An item is not a perquisite or personal benefit if it is integrally and directly related to the performance of the executive's duties," but it is a perquisite if it "confers a direct or indirect benefit that has a personal aspect, without regard to whether it may be provided for some business reason or for the convenience of the company, unless it is generally available on a non-discriminatory basis to all employees." Executive Compensation and Related Person Disclosure, Exchange Act Rel. No. 34-54302A, at 74 (Aug. 29, 2006) ("Adopting Release").  The

---

[3]       In the company's 2019 Schedule 14A and Form 10-K, filed after the initiation of the investigation of this matter, RCI amended this statement to read, "The Company does not provide named executive officers with any significant perquisites or other personal benefits except for personal travel using Company-owned automobiles and/or aircrafts."

Commission emphasized that the "concept of a benefit that is 'integrally and directly related' to job performance is a narrow one," citing a Blackberry and a laptop computer as examples of items that likely would not be perquisites or personal benefits, and the provision of helicopter service to an executive for commuting purposes as an example of a perquisite or personal benefit. *Id.* at 74-76.

### 1. Langan's and EVP's Personal Use of RCI's Corporate Aircraft and RCI's Reimbursement of Their Personal Commercial Flights.

11.     Langan and EVP – who hold pilot's licenses – used RCI-owned aircraft for both business and personal use.  Although management and board members knew about their personal use of the aircraft, RCI failed to maintain policies and procedures concerning their use and disclosure of the value of such use until 2019.

12.     For years, RCI identified the personal use of the aircraft as a tax issue, and provided Langan and EVP with annual federal W-2 forms that included as reportable income the value of their personal use of the aircraft.  However, RCI did not publicly disclose their personal usage until RCI filed its 2018 Form 10-K.  The 2018 disclosure, though, was inadequate because it simply disclosed the taxable value of such use reported on their 2017 W-2 Forms.  As the Commission stated, "perquisites should be based on the value of aggregate incremental cost." Adopting Release at 74.  The Commission further explained that the amount attributed to perquisites for federal tax purposes is not the incremental cost for purposes of its disclosure rules. Id. at n.213.  RCI, however, gave no consideration to disclosing the value of the personal aircraft use in the company's public filings earlier because management missed that issue.

13.     RCI also failed to disclose as executive compensation to Langan and EVP the reimbursement of personal commercial airline flights they took with their significant others. Before January 2019, RCI's unwritten policy was that if "officers" or "upper level personnel" brought their spouse or significant other with them on a business trip, then the company would reimburse the cost of the flight.  Marshall did not know why this type of reimbursement was limited to "upper level management," how long the policy had been in effect, and who determined it.

14.     During FYs 2017 and 2018, RCI reimbursed Langan and EVP for flights they took with their significant others or flights their significant others took alone to or from an RCI business meeting or other event. For example, in FY 2017 RCI reimbursed Langan for flights he and his girlfriend took to and from Cancun, Mexico, or which she took alone from San Francisco.

15.     RCI did not have internal controls or policies and procedures concerning expense reimbursement requests approvals because management never got down to that specific detail.  In the absence of expense reimbursement controls, persons approving reimbursement requests would use their "judgment," resulting in undisclosed compensation to Langan and EVP.   For example, with regard to Langan, RCI, through its accounting department, reimbursed Langan for a trip to New York his girlfriend took to meet him on Valentine's Day while he was on RCI business.

16.    The aggregate incremental cost of the personal use of RCI's aircraft and the reimbursement for personal commercial flights is contained in the following chart.

| Officer | Item | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|---|
| Langan | Aircraft Usage | $17,819 | $29,237 | $55,101 | $79,748 | $66,304 | | $248,209 |
| | Airfare Reimbursement | | | | $2,525 | $3,170 | $1,198 | $6,893 |
| EVP | Aircraft Usage | | | $5,544 | $9,524 | $14,875 | | $29,943 |
| | Airfare Reimbursement | | | | $2,457 | $1,186 | | $3,643 |

### 2.  Failure to Disclose the Full Cost of the Automobile Perquisite

17.    RCI also provides Langan, Marshall, and EVP with company-owned vehicles. Before 2019, however, the company did not maintain adequate internal controls or policies and procedures concerning this perquisite or its disclosure. Langan alone determined the amount of company funds that could be spent to purchase the vehicles.  He never discussed with the board's compensation committee the provision of vehicles for the company's officers.  The figures for the undisclosed aggregate incremental cost of providing automobile to Langan, Marshall, and EVP are as follows.

| Officer | 2017 | 2018 | Total |
|---|---|---|---|
| Langan | $8,461 | $7,634 | $16,095 |
| Marshall | $10,459 | $15,221 | $25,679 |
| EVP | $18,351 | $17,594 | $35,945 |

18.    In FYs 2014 and 2015, RCI disclosed in a footnote to the Summary Compensation Table that its named executives and *their families* "received the use of certain automobiles in each year."  This statement contradicts another disclosure in those filings that said, "The Company does not provide named executive officers with any significant perquisites or other personal benefits except for an automobile for each *executive's business use*." (Emphasis added).  RCI did not disclose the aggregate incremental cost of this automobile perquisite in its annual filings or proxy statements for FYs 2014 and 2015.  From FYs 2016 through 2018, RCI only disclosed the depreciation amounts recorded on each vehicle as the aggregate incremental cost.  The automobile perquisite disclosures did not include the other aggregate incremental costs such as registration, insurance, fuel, maintenance, and repairs until its FY 2019 filings.

### 3.  Failure to Disclose Marshall's House and Meals Perquisite

19.    Marshall commutes weekly from his home near Dallas to RCI's Houston office.  For years, RCI provided Marshall with a meals allowance and housing.  The cost of the meals allowance was $2,326, $2,649, and $2,160 in FYs 2017, 2018 and 2019, respectively, and the cost of housing was $3,024 and $12,329 in FYs 2018 and 2019 respectively.  RCI failed to disclose that it provided housing and a meals allowance to Marshall and the value thereof.

5

**4. Failure to Disclose as Compensation to Langan the Salary RCI Paid to His Girlfriend**

20.    Langan arranged for his girlfriend to be added to the payroll of RCI Management Services, Inc., RCI's operating subsidiary, in December 2014.  RCI removed her from its payroll in June 2019.

21.    RCI provided a salary and other benefits to Langan's girlfriend even though she did not provide significant services to the company, but, rather, operated as a personal assistant for Langan.  Specifically, Langan's girlfriend worked less than 50 hours a year for RCI, delivering items from Langan's home to RCI offices, and providing personal services for Langan, among other things.  Marshall was aware that Langan's girlfriend was on RCI's payroll, but failed to assess whether she was providing significant services to the company or whether her compensation was a disclosable item for RCI in connection with Langan's compensation.  RCI did not have any controls in place concerning the hiring of Langan's girlfriend.

22.    Deducting 50 hours per year of compensation paid to Langan's girlfriend for work she performed for RCI, the estimated cost of her compensation represents, in effect, an executive perquisite to Langan of $106,380 for the five years she was on the payroll.

**5. Failure to Disclose as Compensation to Langan RCI's Charitable Donations to the Private School His Children Attended**

23.     From December 2014 to January 2018, RCI donated a total of $119,655 to the private school two of Langan's children attended.  That amount represented almost 16% of the $771,000 in charitable and political donations the company made during that time.  Langan directed RCI to make these donations.  Before 2019, RCI did not have any internal controls or written policy or procedures concerning RCI making charitable donations.  RCI failed to disclose these donations as compensation to Langan.  Marshall was aware of the donations at the time because he had to sign or approve the checks, but did not question the donations.

**B.    Failure to Disclose Related Party Transactions**

24.    Form 10-K and Schedule 14A require registrants to disclose, pursuant to Item 404, any current or proposed transaction "in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."  Instruction 1 to Item 404 defines the term "related person" as "Any immediate family member of a director or executive officer of the registrant," including a "parent" or "sibling."  Instruction 3 to Item 404 states that dollar amount of the transaction shall be the "aggregate amount of all periodic payments or installments due" to the related person.

25.    RCI's Forms 10K and Schedules 14A from 2014 through 2016 stated that company knew of "no related transactions." RCI's 2017 and 2018 filings also stated that the company knew of no related party transactions, except Langan's guarantee of the company's commercial bank

6

indebtedness.  The company's 2018 10-K also disclosed that a related party loaned RCI $750,000 and that such debt was converted to stock, as discussed below.

### 1.  Hiring Langan Family Businesses

26.    RCI hired businesses owned by Langan's father and brother to make patio furniture for the Bombshell's restaurants.  During FY 2016, RCI paid the father's business $176,684 and during FY 2018, RCI paid the brother's business $321,353.  Given the relationships and the dollar amounts, RCI needed to disclose these transactions, but failed to do so.

27.    Langan's related party transactions should have been identified during RCI's outside counsel's annual process of obtaining officer and director certifications.  Every year, "in anticipation of the filing of the proxy statement" for RCI's upcoming annual meeting, Langan and others were asked to confirm by email, if the certification was correct that there were no disclosable related party transactions.  In 2016 and 2018, Langan inaccurately responded, "correct."

28.    During the relevant time, RCI's accounting system did not provide a consolidated vendor report for all of RCI's hundred or so subsidiaries.  Although transactions with related parties were recorded in RCI's accounting system, this control lapse excluded from related party transaction reports certain payments to Langan's brother and father.

### 2.  Transactions with a Director's Brother

29.    In 2010, a director ("Director"), joined RCI's board of directors serving on the audit, nominating, and compensation committees.  Director's brother ("Director's Brother"), the president of RCI's management company and the director of night club operations, started working for RCI on or about 2000.  As a sibling, Director's Brother, the second highest paid company employee after Langan, was a "related person."

30.    In 2011, Director's Brother loaned RCI $750,000 in exchange for a 10% convertible note with an original maturity of August 2014.  RCI extended the note's maturity twice to 2016 and 2017.  Then, in April 2016, Director's Brother exercised his option and converted the debt to 75,000 shares of RCI's common stock.

31.    Despite the fact that Director's Brother's compensation exceeded $120,000, and that he loaned RCI $750,000, the company failed to disclose related party transactions with him based on his employment, the loan, and the subsequent conversion of the debt to equity.  With regard to the loan, RCI simply disclosed in 2018 that it borrowed the funds from a "related party," without identifying him as required.  RCI cured its disclosure failures after the SEC began its investigation.

32.    Although RCI management knew the Director and his brother were siblings, RCI failed to disclose the relationship as a related-party disclosure.

7

### C.    Other Controls Violations

#### 1.    Langan Authorized the Hiring of a Controller's Wife Who Did Not Provide Services to RCI

33.    In early 2017, one of RCI's controllers ("Controller") and longest tenured employees wanted to bolster his retirement savings.  Controller, therefore, asked Langan if RCI could reduce his salary a certain amount and then place his wife ("Controller's Wife") on RCI's payroll with a salary equivalent to Controller's salary reduction so she could participate in the company's SIMPLE IRA plan.  Controller's Wife would also receive the company's 3% matching retirement contribution.  Pursuant to Langan's approval, RCI paid Controller's Wife an annualized salary of $44,500 in 2017 and $32,500 in 2018 and 2019, plus a 3% SIMPLE IRA matching contribution.  Controller's salary was reduced by the same annualized salary amounts.  Controller's work responsibilities remained the same and did not decrease.  Controller's Wife, however, did not perform any work or provide any services to RCI.

34.    In approving this arrangement, Langan did not consult with anyone at RCI, including the board and its audit committee or Marshall

#### 2.    Langan Directed That RCI Make a Personal Loan to His Business Partner and Friend

35.    In June 2017, Langan directed that RCI make a one-year, $300,000 unsecured personal loan at 6% interest to his friend and business partner ("Friend").  Friend's company was RCI's main general contractor responsible for building many of RCI's Bombshells restaurants and its new headquarters facility.  Langan authorized this loan, and instructed RCI personnel to draft a note and send the money, but did not advise Marshall, RCI's board, or the audit committee about the loan.  The loan was made in order for Friend to purchase real estate on which to build a home.  At the time RCI made this loan, the company did not have any internal controls or policies and procedures concerning the company making loans.  This loan has since been repaid, after three extensions.

#### 3.   Tickets to Events

36.    In 2016 through 2018, RCI purchased tickets to many sporting, concert, and other entertainment events, as well as food for many of those events.  Langan generally was the only person who authorized the purchase of those tickets.  These expenses were recorded as "Employee Relations," and employees could request to use the tickets.  However, the tickets were sometimes given to family members for personal use.  The company, though, did not maintain any records of who attended the events and whether the tickets were for business or personal use.

### VIOLATIONS

37.    Section 14(a) of the Exchange Act prohibits any person from acting in contravention of the Commission's rules and regulations "to solicit or *to permit the use of his name*

*to solicit any proxy* . . . in respect of any security . . . registered pursuant to Section 12" of the Exchange Acts (emphasis added).  Rule 14a-3 prohibits issuers with securities registered pursuant to Section 12 of the Exchange Act from soliciting proxies without furnishing proxy statements containing the information specified in Schedule 14A, including executive compensation disclosures pursuant to Items 402 and 404.  Rule 14a-9 prohibits the use of proxy statements containing materially false or misleading statements or materially misleading omissions.

38.      As a result of the conduct described above, RCI, which solicited the annual proxies and Langan, as an RCI director and director nominee who permitted his name to be used in connection with RCI's proxy solicitation, violated Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9 thereunder.

39.      As a result of the conduct described above, Langan and Marshall caused RCI to violate Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9 thereunder.

40.      As a result of the conduct described above, RCI violated and Langan and Marshall caused RCI to violate, Section 13(a) of the Exchange Act and Rules 13a-1, and 12b-20 thereunder, which require every issuer of a security registered pursuant to Section 12 of the Exchange Act to file with the Commission information, documents, and annual and quarterly reports as the Commission may require, and mandate that periodic reports contain such further material information as may be necessary to make the required statements not misleading.

41.      As a result of the conduct described above, RCI violated, and Langan and Marshall caused RCI to violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, which require reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets and to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary and to maintain the accountability of assets.

42.      As a result of the conduct described above, RCI violated, and Langan and Marshall caused RCI to violate, Rule 13a-15(a) under the Exchange Act, which requires issuer to maintain disclosure controls and procedures.

## RCI's Remedial Efforts and Cooperation

43.      In determining to accept the Offer, the Commission considered remedial acts undertaken by Respondent RCI and cooperation afforded the Commission staff. Specifically, RCI undertook remedial efforts including (i) engagement of outside counsel to conduct an independent investigation; (ii) engagement of a third-party consultant to assist in reviewing and revising its executive compensation process, policies and controls; and (iii) implementing new internal controls and compliance policies and procedures concerning perquisites, aircraft usage, expense reimbursement, travel, and charitable contributions, related party transactions, and family employment. In addition, RCI shared the results of its outside counsel's independent investigation with the Commission staff.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in the Respondents' Offers.

Accordingly, it is hereby ORDERED that:

A.      Pursuant to Section 21C of the Exchange Act, Respondents cease and desist from committing or causing any violation and any future violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) and Rules 12b-20, 13a-1, 13a-15, 14a-3, and 14a-9 thereunder.

B.      RCI shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $400,000.00 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

C.      Langan shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $200,000.00 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

D.      Marshall shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $35,000.00 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)      Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying RCI, Langan, and Marshall as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Anita Bandy, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-6561.

E.   Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondents agrees that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondents agrees that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Langan and Marshall, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Langan and Marshall under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violations by Langan and Marshall of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Vanessa A. Countryman
 Secretary

11