**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re RCI Hospitality Holdings, Inc. Securities Litigation | Master File No. 4:19-cv-01841-AHB |

**DECLARATION OF KARA M. WOLKE IN SUPPORT OF: (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................2

II. PROSECUTION OF THE ACTION.........................................................................6

    A.    Background..........................................................................................................6

    B.    Commencement Of The Action And Appointment Of Lead Plaintiffs And Lead Counsel .............................................................................................................7

    C.    The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint .........................................................................................................7

    D.    Defendants' Motion To Dismiss, Plaintiffs' Response Thereto, And Plaintiffs' Notice of Supplemental Authority..................................................................8

    E.    Fact Discovery..................................................................................................10

    F.    Preparation for Class Certification .................................................................11

    G.    Mediation Efforts, Settlement Negotiations, and the Settlement's Preliminary Approval ..........................................................................................................11

III. THE RISKS OF CONTINUED LITIGATION....................................................12

    A.    Risks Faced In Obtaining And Maintaining Class Action Status..........................12

    B.    Risks To Proving Liability ...............................................................................13

    C.    Risks to Proving Damages.................................................................................14

    D.    Other Risks, Including Trial And Appeals .......................................................15

    E.    The Settlement Is Reasonable In Light Of Potential Recovery In The Action .....15

IV. PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE NOTICE PROGRAM .........................................16

V. ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT...........................19

VI. LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES ........................................................................22

    A.    The Fee Application ........................................................................................23

        1.    The Outcome Achieved is the Result of the Significant Time and Labor that Plaintiffs' Counsel Devoted to the Action..............................................23

2. The Significant Risks Borne by Plaintiffs' Counsel...................................26

3. The Experience And Expertise Of Plaintiffs' Counsel And The Standing And Caliber of Defendants' Counsel...........................................................27

4. Public Policy Interests, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases ...............27

5. The Reaction Of The Settlement Class Support Lead Counsel's Fee Request .......................................................................................................28

B. Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable 28

VII. CONCLUSION ...................................................................................................31

# TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | TITLE |
|---------|-------|
| 1 | Declaration Of Josephine Bravata Concerning: (A) Mailing Of The Postcard Notice; (B) Publication Of The Summary Notice; And (C) Report On Requests For Exclusion And Objections |
| 2 | Declaration Of Kara M. Wolke, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of Glancy Prongay & Murray LLP |
| 3 | Declaration Of Phillip Kim, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of The Rosen Law Firm, P.A. |
| 4 | Declaration Of Joe Kendall, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of The Kendall Law Group, PLLC |
| 5 | Declaration Of Brian Schall, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of The Schall Law Firm |
| 6 | Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022) |
| 7 | Select Fifth Circuit Cases Awarding Attorneys' Fee Awards Of 33% Or Above |
| 8 | Table Of Peer Law Firm Billing Rates |

I, Kara M. Wolke, declare the following pursuant to 28 U.S.C. §1746:

1. I am an attorney duly licensed to practice law before all of the courts of the State of California and I am admitted *pro hac vice* in this action. I am a partner in the law firm of Glancy Prongay & Murray LLP ("GPM"), co-Lead Counsel for Lead Plaintiffs Roger DeMaggio, Patrick Prahl, Justin Kinslow, Joseph Milo, and Edgar M. Kee ("Plaintiffs") in the above-entitled action (the "Action").[1] The Rosen Law Firm, P.A. ("Rosen Law") served as co-Lead Counsel with GPM, The Kendall Law Group, PLLC ("Kendall Law") served as Court-appointed liaison counsel, and The Schall Law Firm ("Schall Law") served as additional counsel for Plaintiffs. GPM, Rosen Law, Kendall Law, and Schall Law are referred to collectively herein as "Plaintiffs' Counsel." I am familiar with the proceedings in this litigation, and I have personal knowledge of the matters set forth herein based upon supervising and participating in the Action.

2. I respectfully submit this declaration, together with the attached exhibits, in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently-filed memorandum in support thereof ("Final Approval Memorandum"). As set forth in the Final Approval Memorandum, Plaintiffs seek final approval of the $2,200,000 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3. I also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently-filed memorandum in support thereof ("Fee Memorandum").[2] As set forth in the Fee

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Stipulation and Agreement of Settlement, dated April 14, 2022 (the "Stipulation"). ECF No. 70-1.

[2] Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses is made on behalf of Plaintiffs' Counsel.

Memorandum, Lead Counsel seeks an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund (which, by definition, includes interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $108,016.85 which includes Plaintiffs' Counsel's out-of-pocket litigation costs of $93,016.85, and a total of $15,000.00 to Plaintiffs ($3,000 each), pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their costs, including lost wages, incurred in connection with their representation of the Settlement Class.

4. The Court preliminarily approved the proposed Settlement by Order dated April 28, 2022 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 71. Pursuant to the Preliminary Approval Order, Strategic Claims Services. ("SCS") the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication.

5. In total, 13,638 Postcard Notices have been mailed or emailed to potential Settlement Class Members, and thus far, no requests for exclusion and no objections have been received.

## I. INTRODUCTION

6. This is a consolidated securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act. Plaintiffs asserted claims against defendant RCI Hospitality Holdings, Inc. ("RCI" or the "Company") and defendants Eric Langan ("Langan"), Phillip Marshall ("Marshall"), Nour-Dean Anakar ("Anakar"), and Steven L. Jenkins ("Jenkins") (collectively, "Individual Defendants," and, together with RCI, "Defendants").

7. On February 24, 2020, Plaintiffs filed and served their Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), asserting violations of the Exchange Act. ECF No. 27. The Complaint alleged that Defendants failed to disclose certain material related-party transactions ("RPTs") and misrepresented the adequacy of its internal controls to the investing public. The Complaint further alleged that the prices of RCI's publicly-traded securities were artificially inflated as a result of Defendants allegedly false and misleading statements and omissions, and declined when the truth was revealed. ECF No. 27.

8. The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $2,200,000 (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, Plaintiffs and Lead Counsel submit that the proposed Settlement represents a fair and adequate result for the Settlement Class considering the case's procedural posture as well as the significant risks remaining in the Action.

9. Additionally, the $2,200,000 cash Settlement Amount is well within the range of reasonableness under the circumstances to warrant final approval of the Settlement. Plaintiffs' damages expert estimates that if Plaintiffs had *fully prevailed* on their claims at both summary judgment and after a jury trial, the Court certified the Settlement Class, and the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' *best case scenario*—the total *maximum* damages would be approximately $15.6 million. Thus, the $2,200,000 Settlement Amount represents approximately 14.1% of the total *maximum* damages *potentially* available in this Action. Conversely, if Plaintiffs were unsuccessful in certifying a class or proving the elements of their claims, the maximum recoverable damages could be drastically reduced or potentially even eliminated entirely.

10.     A recovery above the 1.8% median settlement for securities litigation matters is well-within the range of reasonableness.  *See, e.g.*, Ex. 6 (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022) at p. 24, Fig. 22 (median recovery in securities class actions in 2021 was approximately 1.8% of estimated damages).  Consequently, the amount recovered by Plaintiffs, when balanced against the risks of continued litigation, weighs strongly in favor of final approval.

11.     Indeed, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay.

12.     The Settlement was reached after nearly three years of contested litigation. Plaintiffs' Counsel's efforts involved, among other things: (a) conducting a detailed and substantive investigation into RCI and the facts forming the basis for the claims asserted in the Action, including retaining and working with private investigators; (b) based on this investigation, filing the Complaint; (c) consulting with experts in the fields of accounting, market efficiency, loss causation and damages; (d) researching, drafting, and filing an opposition to Defendants' motion to dismiss; (e) researching, drafting, and filing a request for judicial notice of two exhibits and a notice of supplemental authority; (f) engaging in fact discovery, including but not limited to, (i) exchanging initial disclosures, (ii) serving requests for production of documents, (iii) negotiating a protective order and the electronically-stored information ("ESI") protocol, (iv) serving three (3) third-party subpoenas, and (v) reviewing and analyzing approximately 46,000 pages of documents from Defendants and third parties; and (g) participating in mediation and engaging in further negotiations with a well-respected neutral.

13. In preparation for the mediation, Lead Counsel drafted a detailed mediation statement supported by evidence, and thoroughly reviewed and analyzed Defendants' mediation statement. Lead Counsel also drafted a detailed reply statement addressing Defendants' arguments supported by additional evidence. Following the exchange of detailed mediation and reply statements addressing both liability and damages, Lead Counsel prepared for and engaged in full-day mediation session overseen by an experienced mediator of complex cases, Michelle Yoshida, Esq. of Phillips ADR, which ended without an agreement to settle. However, based on the significant submissions addressing both the factual and legal basis for the Parties' respective positions and the full-day session, which included direct discussions, Ms. Yoshida conducted further negotiations via telephone and electronic mail. These negotiations culminated in the Parties accepting Ms. Yoshida's recommendation to settle the Action for $2,200,000 on or about January 22, 2022. The proposed Settlement is, therefore, the result of arm's length negotiations between and among well-informed, highly experienced counsel, with the aid and oversight of an experienced neutral mediator.

14. Based on the foregoing efforts, Plaintiffs and Plaintiffs' Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

15. In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation

5

with the assistance of Plaintiffs' damages consultant. The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

16. Finally, Lead Counsel, on behalf of Plaintiffs' Counsel, seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee Memorandum. As discussed in detail in the accompanying Fee Memorandum, the requested 33⅓% fee is within the range of percentage awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and warranted in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested out-of-pocket litigation costs of $93,016.85 and the requested reimbursements of costs pursuant to the PSLRA, including lost wages, totaling $15,000 ($3,000 to each Plaintiff) are also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II. PROSECUTION OF THE ACTION

### A. Background

17. Plaintiffs allege that Defendants made materially false and misleading statements and omissions during the period of December 13, 2016 through and including July 18, 2019 (the "Settlement Class Period") concerning certain material RPTs, which included either under-reporting or omitting the following: (1) RCI's transactions with a furniture fabrication company, first owned by Langan's father and then Langan's brother; (2) executive compensation for certain executives for the use of a corporate jet; (3) the salary of Defendant Nour-Dean Anakar's (an RCI

board member) brother for his employment as RCI's Director of Operations; and (4) personal bankruptcy petitions filed by Defendant Steven Jenkins, an RCI board member. Plaintiffs further alleged that Defendants made materially false and misleading statements about the adequacy of the Company's internal controls during the Settlement Class Period. As a result of the materially false and misleading statements made by Defendants, Plaintiffs allege, the prices of RCI's publicly-traded securities were artificially inflated and declined when the truth was revealed.

**B.    Commencement Of The Action And Appointment Of Lead Plaintiffs And Lead Counsel**

18.    Beginning on May 21, 2019, three class action complaints were filed in the United States District Court for the Southern District of Texas (the "Court"), styled *Hoffman v. RCI Hospitality Holdings, Inc. et al.*, No. 4:19-cv-01841 (AHB), *Gu v. RCI Hospitality Holdings, Inc. et al.*, No. 4:19-cv-01917 (KPE), and *Grossman v. RCI Hospitality Holdings, Inc. et al.*, No. 4:19-cv-02318 (KMH).

19.    By Order dated January 10, 2020, the Court ordered that the cases be consolidated and recaptioned as *In re RCI Hospitality Holdings, Inc. Securities Litigation*, Master File No. 4:19-cv-01841; appointed Roger DeMaggio, Patrick Prahl, Justin Kinslow, Joseph Milo, and Edgar M. Kee as Lead Plaintiffs for the consolidated action; and approved Plaintiffs' selection of Glancy Prongay & Murray LLP and The Rosen Law Firm, P.A. as Lead Counsel and Kendall Law Group, PLLC as liaison counsel for the class. ECF No. 23.

**C.    The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint**

20.    In preparation for filing the Complaint, Lead Counsel conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) RCI's filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) public reports, blog posts, research reports prepared by securities and financial

7

analysts, and news articles concerning RCI, (iii) RCI's investor call transcripts, (iv) press releases published by and regarding RCI, (v) documents produced in response to a Freedom of Information Act ("FOIA") request to the SEC, and (vi) court filings, UCC filings, and other publicly available material related to RCI and other relevant third parties; (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; (c) researching the applicable Generally Accepted Accounting Principles ("GAAP") pertaining to RPTs; (d) consulting and working with an accounting expert to analyze RCI's Settlement Class Period financial results, including the reported and revised RPTs; and (e) working with a damages and loss causation expert to analyze RCI's stock price movements.

**D.      Defendants' Motion To Dismiss, Plaintiffs' Response Thereto, And Plaintiffs' Notice of Supplemental Authority**

21.      On February 24, 2020, Lead Plaintiffs filed and served the Complaint asserting claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against Individual Defendants under Section 20(a) of the Exchange Act.   Among other things, the Complaint alleged that Defendants made materially false and misleading statements and omissions about the Company's related party transactions and the adequacy of its internal controls.   The Complaint further alleged that the prices of RCI's publicly-traded securities were artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed.   ECF No. 27.

22.      On April 24, 2020, Defendants filed and served a motion to dismiss the Complaint. ECF No. 37.   Among other things, Defendants argued that Plaintiffs failed to plead a strong inference of scienter related to Defendants' non-disclosure of: (1) RCI's purchases from Langan's relatives, (2) RCI's employment of a board member's brother, (3) executive compensation for

8

certain executives for the use of a corporate jet, and (4) an outside director's personal bankruptcies. Specifically, Defendants argued that an inadvertent error in disclosure does not amount to scienter. Defendants also challenged Plaintiffs' allegations that RCI wrongfully omitted RPTs with Louis Tannos, owner of Tannos Construction, on the basis that neither Tannos or Tannos Construction qualified as a "related person" under Item 404 of Regulation S-K ("Item 404"). And finally, Defendants challenged Plaintiffs' internal control claims and argued that Plaintiffs did not adequately plead a false or misleading statement or scienter.

23. On June 23, 2020, Plaintiffs opposed Defendants' motion to dismiss. ECF Nos. 38-39. Plaintiffs argued that the Complaint adequately alleged that Defendants made misleading statements or omissions in violation of Section 10(b) of the Exchange Act by omitting material RPTs, under-reporting executive compensation, and misrepresenting the efficacy of the Company's internal controls. Plaintiffs asserted that the well-pleaded facts in the Complaint also raised a strong inference of scienter as to each Individual Defendant. More specifically, Plaintiffs argued, *inter alia*, scienter was supported by the fact that (i) both Langan and Marshall were *not* lay persons ignorant of SEC reporting requirements, and (ii) Defendants *did* disclose one material RPT thereby undercutting Defendants' ignorance argument.

24. On May 22, 2019, Defendants filed and served their reply papers in support of their motion to dismiss. ECF No. 41.

25. On September 28, 2020, Lead Plaintiffs filed and served a request for judicial notice of two exhibits and a notice of supplement authority. ECF No. 42. On October 8, 2020, Defendants filed their response to Lead Plaintiffs' request. ECF No. 43.

26. On March 31, 2021, the Court denied Defendants' motion to dismiss in its entirety. ECF No. 44. In the Court's Order, the Court denied without prejudice Plaintiffs' request for

9

judicial notice as moot because the Complaint was sufficient to survive Defendants' motion to dismiss. *Id.* at 3.

### E. Fact Discovery

27. From April 2021 to January 2022, the Parties began to engage in fact discovery. On April 30, 2021, the Parties submitted a joint discovery / case management plan pursuant to the Court's Order entered on August 27, 2019 as well as Rule 26(f) of the Federal Rules of Civil Procedure.

28. Plaintiffs then researched and drafted their initial disclosures, which the Parties exchanged on May 24, 2021. After exchanging initial disclosure, the Parties negotiated a Protective Order, which the Court entered on June 21, 2021 (ECF No. 57), and an ESI Protocol, which the Court entered on July 19, 2021 (ECF No. 58).

29. Plaintiffs then propounded comprehensive Requests for Production of Documents on Defendants on June 29, 2021. Plaintiffs analyzed Defendants' responses and objections to Plaintiffs' Requests for Production of Documents, in preparation for addressing and resolving any disputes relating to the scope of Defendants' discovery responses. Plaintiffs also began to identify, and conduct research relating to, third parties likely to have relevant documents, including Defendants' affiliates, Tannos Construction, Creative Steel Designs, and Sherwood Forest Creations LLC. Plaintiffs then served subpoenas for production of documents on each of the identified affiliates.

30. Following entry of the ESI Protocol, Plaintiffs drafted proposed search terms for the collection and production of ESI. Defendants began producing documents in August 2021. Over the course of the approximately nine-month discovery period, Lead Counsel reviewed and analyzed more than 45,936 pages of documents produced by Defendants and third parties.

**F. Preparation for Class Certification**

31. While fact discovery was ongoing, Plaintiffs began preparing their motion for class certification, which was scheduled to be filed on January 25, 2022. Plaintiffs worked closely with Dr. Adam Werner, an economic expert, who drafted a report on market efficiency for RCI securities to be submitted in conjunction with Plaintiffs' anticipated class certification motion.

32. The Parties entered in the proposed Settlement prior to the deadline for filing Plaintiffs' motion for class certification (*see* ¶36, *infra*). Accordingly, Plaintiffs' motion for class certification was never filed.

**G. Mediation Efforts, Settlement Negotiations, and the Settlement's Preliminary Approval**

33. While the Parties were engaged in fact discovery and preparing for class certification, they agreed to explore the possibility of settlement and selected Michelle Yoshida, Esq. to serve as the mediator.

34. In advance of the mediation session, Lead Counsel dedicated substantial efforts to preparing a persuasive, evidence-based mediation statement setting forth the facts relevant to the underlying alleged misrepresentations and omission, and analyzing applicable facts and law. The Parties then exchanged mediation statements. After reviewing and analyzing Defendants' mediation statement, Lead Counsel drafted an evidence-based mediation reply rebutting Defendants' arguments.

35. On January 13, 2022, Lead Counsel and Defendant's Counsel participated in a full-day mediation session with Ms. Yoshida. During the mediation session, the Parties engaged in full and frank discussions concerning the merits of this Action, including, for example, the facts alleged to support Plaintiffs' claims. This negotiation process enabled the Parties to meaningfully assess the relative strengths and weaknesses of their respective claims and defenses. Although the

Parties did not reach an agreement to settle the case, Ms. Yoshida continued discussions with the Parties over the following weeks. Ultimately, Ms. Yoshida made a mediator's proposal that the Parties settle the matter for $2,200,000 in cash.

36. On January 22, 2022, the Parties accepted the mediator's proposal, agreeing to settle the Action for $2,200,000, subject to the execution of a customary long-form stipulation and agreement of settlement and related papers. On January 24, 2022, the Parties informed the Court of the proposed Settlement and asked the Court to suspend all case deadlines while they negotiated and executed a long-form Settlement agreement and exhibits. ECF No. 65. Lead Plaintiffs then filed their Motion for Preliminary Approval of the Settlement on April 15, 2022. ECF No. 69.

37. On April 28, 2022, the Court issued its Order Preliminarily Approving Settlement and Providing for Notice. ECF No. 71.

## III. THE RISKS OF CONTINUED LITIGATION

38. The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $2,200,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

### A. Risks Faced In Obtaining And Maintaining Class Action Status

39. Defendants likely would have argued against class certification. While Lead Counsel researched and analyzed class certification and are confident that all of the Rule 23 requirements would have been met, and the Court certifying the proposed class, Plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised arguments challenging the propriety of class certification. Moreover, even if Plaintiffs successfully obtained

12

class certification, Defendants could have sought permission from the Fifth Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Class certification was, by no means, a forgone conclusion.

40. Additionally, a ruling by the United States Supreme Court has made obtaining class certification for Plaintiffs more difficult and could potentially provide additional challenges should the litigation against Defendants proceed. In *Goldman Sachs Grp. v. AR Teacher Ret.*, 141 S.Ct. 1951 (June 21, 2021), the Supreme Court held, in part, that when defendants are seeking to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may consider the generic nature of an alleged misrepresentation as evidence of lack of price impact. Accordingly, courts are now permitted to assess materiality of an alleged misstatement and consider "all evidence relevant to price impact" at the class certification stage. On the plus side for Plaintiffs, the Supreme Court did clarify that defendants bear the burden of persuasion of showing a lack of price impact by a preponderance of the evidence.

**B.     Risks To Proving Liability**

41. In addition to the hurdle of obtaining class action status, Plaintiffs and Lead Counsel faced numerous additional risks at summary judgment and trial, including establishing Defendants' liability. Defendants forcefully argued in their motion to dismiss—and undoubtedly would have continued to argue at summary judgment and/or trial—that Plaintiffs could not establish the required elements of their Exchange Act claims.

42. For instance, Defendants strenuously argued, and would continue to argue, among other things: (1) that for purposes of Item 404, neither Louis Tannos or his business, Tannos Construction, qualified as "related person" under Item 404 and thus any transaction between RCI

and Tannos Construction, regardless of the amount, would not qualify as an RPT requiring disclosure; and (2) certifying the adequacy of a company's internal controls is a personal statement requiring knowledge of the statement's falsity, which Plaintiffs could not show in this case.

43. Defendants also argued that Plaintiffs would not be able to prove a strong inference of scienter related to Defendants' non-disclosure of: (1) RCI's purchases from Langan's relatives, (2) RCI's employment of a board member's brother, (3) executive compensation for certain executives for the use of a corporate jet, and (4) an outside director's personal bankruptcies. Specifically, Defendants would likely argue that evidence would demonstrate that their non-disclosure was simply a misunderstanding of Regulation S-K's instructions and that this type of inadvertent error does not amount to scienter.

44. While Plaintiffs sufficiently alleged and believed they were building a strong circumstantial case, there was no guarantee that documents and deposition testimony obtained during fact discovery would support their narrative of the case. Additionally, if Plaintiffs advanced past summary judgment and proceeded to trial, substantial uncertainty remains as to how a trier of fact would view each side's narrative of the events at issue.

## C. Risks to Proving Damages

45. Even if Plaintiffs were successful in establishing liability, they would still face substantial risks in establishing damages on a class-wide basis. For example, Defendants would certainly have disputed damages by claiming that there was no causal connection between RCI's allegedly misleading disclosures and drops in the Company's stock price, and even if there were such a connection, the damages suffered by the class were a mere fraction of the amount sought by Plaintiffs.

14

**D. Other Risks, Including Trial And Appeals**

46. Plaintiffs would have had to prevail at several stages of litigation, each of which would have presented significant risks in complex class actions such as this one. Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured. In fact, GPM recently lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.). Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

47. Even if Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal not only would have renewed risks faced by Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay and further depletion of RCI's already wasting insurance policies. Given these significant litigation risks, Plaintiffs and Lead Counsel believe the Settlement represents a fair result for the Settlement Class.

**E. The Settlement Is Reasonable In Light Of Potential Recovery In The Action**

48. In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. If Plaintiffs had fully prevailed in each of their claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' best-case scenario—estimated total ***maximum***

15

damages are approximately $15.6 million. Under this scenario, the Settlement represents a recovery of 14.1% of the Settlement Class's maximum estimated damages. In comparison, the median recovery in securities class actions in 2021 was approximately 1.8% of estimated damages. See Ex. 6 (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022 at p. 24 (Fig. 22)).

## IV. PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE NOTICE PROGRAM

49. The Preliminary Approval Order (ECF No. 71) directed that the postcard notice highlighting key information regarding the proposed Settlement (the "Postcard Notice") be disseminated to the Settlement Class. The Preliminary Approval Order also set a deadline of July 22, 2022 (21 calendar days prior to the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee Memorandum or to request exclusion from the Settlement Class and set a final fairness hearing date of August 12, 2022 (the "Settlement Hearing").[3]

50. Pursuant to the Preliminary Approval Order, Lead Counsel instructed SCS, the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed SCS to post downloadable copies of the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim and Release Form (the "Claim Form") online at

---

[3] Following the entry of the Preliminary Approval Order, the Court granted the Motion for Continuance of Final Settlement Hearing, which rescheduled the Settlement Hearing to August 12, 2022. ECF No. 73.

www.RCIHoldingsSecuritiesSettlement.com (the "Settlement Website"). Upon request, SCS mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

51. The Postcard Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a claim and access to downloadable versions of the Notice and Claim Form. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of a Settlement Class Member's right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee Memorandum, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $135,000.00 which may include an application for reimbursement of the reasonable costs and expenses incurred by Plaintiffs related to their representation of the Settlement Class.

52. To disseminate the Postcard Notice, SCS obtained from Defendants' Counsel, the names and addresses of 23 record holders of RCI common stock that are potential Settlement Class Members. On May 16, 2022, SCS disseminated copies of the Postcard Notice to each of the 23 potential Settlement Class Members by first-class mail. *See* Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Bravata Decl."), attached hereto as Exhibit 1.

53. In addition, SCS maintains a proprietary database with names and addresses of the largest and most common banks, brokers, and other nominees (the "Master Mailing List"). *See id.*

17

at ¶4. At the time of the initial mailing, the Master Mailing List contained 1,926 mailing records. On May 13, 2022, SCS caused the Postcard Notice to be sent by First-Class Mail to the 1,926 addresses whose mailing records were contained in the Master Mailing List. *Id.*

54. Following the mailing to the Master Mailing List, SCS received an additional 7,611 names and addresses of potential Settlement Class Members from individuals or brokerage firms, banks, institutions, and other nominees. *See id.* at ¶6. SCS also received requests from brokers and other nominee holders for 2,845 Postcard Notices to be forwarded by the nominees to their customers and SCS received notification from two nominees that they mailed the Postcard Notice to 255 of their customers. *Id.*

55. Additionally, SCS emailed 6 links of the Notice and Claim Form to the settlement website to the email addresses provided by Lead Counsel, and SCS was notified by a nominee that they emailed 2,897 of their clients to notify them of this settlement and provided the link to the Notice and Claim Form on the settlement website. *See id.* at ¶7.

56. As of July 7, 2022, an aggregate of 13,638 Postcard Notices have been sent and links to the Settlement Website emailed to potential Settlement Class Members and their nominees. *Id.* at ¶8.

57. On June 6, 2022, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*. *See id.* at ¶10; Ex. 1-D (copies of publication confirmations).

58. Lead Counsel also caused SCS to establish the Settlement Website, which became operational on May 13, 2022, and maintained a toll-free telephone number to provide Settlement Class Members with information concerning the Settlement, submit a claim online, download

18

copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and the Complaint. Bravata Decl. at ¶¶11-12.

59. The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the Fee Memorandum or to request exclusion from the Settlement Class is July 22, 2022. To date, no requests for exclusion have been received. *Id.* at ¶13. SCS will file a supplemental affidavit after the July 22, 2022 deadline addressing whether any requests for exclusion have been received. To date, no objections to the Settlement or the Plan of Allocation have been entered on this Court's docket or have otherwise been received by Plaintiff's Counsel. Lead Counsel will file reply papers by August 5, 2022 that will address any objections that may be received.

## V. ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

60. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $2.2 million Settlement Amount, plus interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Plaintiffs for their costs and expenses incurred in representing the Settlement Class); and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than September 23, 2022. *See* Ex. 1-B (Notice) at p. 3. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

61. The proposed Plan of Allocation is detailed in the Notice. *See* Ex. 1-B (Notice, pp. 9-12). The long-form Notice is posted online at the Settlement Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member. The Plan of Allocation's

19

objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the alleged violations of the Exchange Act, as opposed to losses caused by market, industry, Company-specific factors or factors unrelated to the alleged violations of law, and takes into consideration when each Authorized Claimant purchased and/or sold shares of RCI common stock. *See* Ex. 1-B (Notice at ¶51).

62. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* at ¶51.

63. The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of RCI common stock was artificially inflated during the period from December 13, 2016 through and including July 18, 2019 due to Defendants' alleged materially false and misleading statements and omissions. The Plan of Allocation is based on the premise that the decrease in the price of RCI common stock following the alleged corrective disclosures on May 12, 2019 and July 18, 2019 may be used to measure the alleged artificial inflation in the price of RCI common stock prior to these disclosures.

64. Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro*

*rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* at ¶51.

65. An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and how many shares of RCI common stock the Claimant purchased, acquired, or sold during the Settlement Class Period and when that Claimant bought, acquired, or sold the shares. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in RCI stock during the Settlement Class Period, or if the Claimant purchased shares during the Settlement Class Period, but did not hold any of those shares through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. Lead Counsel believes that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

66. If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. *Id.* at ¶54. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost-prohibitive.[4]

---

[4] If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective. Ex. 1-B (Notice at ¶52). At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance shall be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel and approved by the Court.

67.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Intersect common stock that were attributable to the conduct alleged in the Complaint.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

68.     As noted above, as of July 7, 2022, 13,638 copies of the Postcard Notice which directs Settlement Class Members to the Settlement Website containing the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members.  *See* Bravata Decl. at ¶8; Ex. 1-A (Postcard Notice).  To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

69.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 33⅓% of the Settlement Fund (or $733,333.33, plus interest earned at the same rate as the Settlement Fund).  Lead Counsel also request reimbursement of Litigation Expenses in the amount of $108,016.85, which includes $93,016.85 in out-of-pocket expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund, and a total of $15,000 to Plaintiffs ($3,000 each) for their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class.  The total Litigation Expenses amount of $108,016.85 is well below the maximum expense amount of $135,000 set forth in the Notice.  The legal authorities supporting a 33⅓% fee award are set forth in the accompanying Fee Memorandum, which is being filed contemporaneously

herewith. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

## A.  The Fee Application

70.  Lead Counsel are applying for a percentage-of-the-common-fund fee award to compensate them for the services they rendered on behalf of the Settlement Class. As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm minimizes unnecessary drain on the Court's resources. Notably, the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Fifth Circuit for cases of this nature.

71.  Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved. As discussed in the Fee Memorandum, a 33⅓% fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

### 1.  The Outcome Achieved is the Result of the Significant Time and Labor that Plaintiffs' Counsel Devoted to the Action

72.  Attached hereto as Exhibits 2 through 5 are declarations from Plaintiffs' Counsel in support of an award of attorneys' fees and reimbursement of Litigation Expenses. Included within each supporting declaration is a schedule summarizing the hours and lodestar of each firm

23

from the inception of the case through July 5, 2022, a summary of expenses by category, and a firm resume.[5] The following is a chart of lodestar amounts for Plaintiffs' Counsel:

| LAW FIRM: | LODESTAR |
|---|---|
| Glancy Prongay & Murray LLP | $693,931.00 |
| The Rosen Law Firm, P.A. | $490,950.00 |
| Kendall Law Group, PLLC | $16,065.00 |
| Schall Law Firm | $22,700.00 |
| TOTAL LODESTAR | $1,223,646.00 |

73.     The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation.  Additionally, the rates billed by Plaintiffs' Counsel attorneys (ranging from $800-1,050 per hour for partners, $625-750 per hour for associates, and $415 for staff attorneys) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude.  *See* Ex. 8 (table of peer law firm billing rates).

74.     As set forth above and in detail in Exhibits 2 through 5, Plaintiffs' Counsel have collectively expended a total of 1,931.6 hours in the investigation and prosecution of the Action through and including July 5, 2022.  The resulting total lodestar is $1,223,646.00.  The requested fee amount of 33⅓% of the Settlement Fund equals $733,333.33 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a 0.6 multiplier of Plaintiffs' Counsel's lodestar, and is not only reasonable, but is modest when viewing the range of fee multipliers typically awarded in comparable securities class action and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

75.     Moreover, in addition to drafting the motion for final approval, Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval.

---

[5] Time expended in preparing the application for fees and reimbursement of Litigation Expenses has not been included.

Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process. No additional compensation will be sought for this work.

76. As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action. Lead Counsel maintained control of, and monitored the work performed by, lawyers and other personnel on this case. I personally devoted substantial time to this case and oversaw and/or was personally involved in drafting or reviewing and editing all pleadings, court filings, various discovery-related materials, meditation statements, and other correspondence prepared on behalf of Plaintiffs, communicating with Plaintiffs on a regular basis, engaging with Defendants' counsel on a variety of matters, and was intimately involved in Settlement negotiations. Other experienced attorneys were involved with drafting, reviewing and/or editing pleadings, court filings, various discovery-related materials, and the mediation submissions, communicated with Plaintiffs, the mediation process, negotiating the terms of the Stipulation, and other matters. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

77. Plaintiffs' Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 2. The Significant Risks Borne by Plaintiffs' Counsel

78. This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent-fee basis. From the outset, this Action was an especially difficult and highly uncertain securities case. There was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a case like this one were covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and incurred $93,016.85 in out-of-pocket litigation-related expenses in prosecuting the Action.

79. Additionally, Plaintiffs and Plaintiffs' Counsel developed and then alleged the Exchange Act claims without information gained through subpoena power and hindered by the PSLRA's automatic discovery stay.

80. Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement. *See supra*, ¶46. On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

81. Plaintiff's Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In

26

circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 3. The Experience And Expertise Of Plaintiffs' Counsel And The Standing And Caliber of Defendants' Counsel

82. As demonstrated by the firm resumes, attached hereto as Exhibits 2 through 5 Plaintiffs' Counsel are highly experienced and skilled laws firms that focus their practices on securities class action litigation. Indeed, Lead Counsel have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country. Lead Counsel enjoy well-deserved reputations for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters. I believe Plaintiffs' Counsel's experience added valuable leverage in the settlement negotiations.

83. Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendant was represented by DLA Piper LLP (US), a well-known international law firm that vigorously represented the interests of its client throughout this Action. In the face of this experienced and formidable opposition, Lead Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that were highly favorable to the Settlement Class.

### 4. Public Policy Interests, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases

84. Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors,

particularly large investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a particular securities class action. Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements

### 5. The Reaction Of The Settlement Class Support Lead Counsel's Fee Request

85. As noted above, as of July 7, 2022, 13,638 Postcard Notices have been mailed advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund. Bravata Decl. ¶8; Ex. 1-A (Postcard Notice). In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *Globe Newswire*. Bravata Decl. at ¶10; Ex. 1-D (confirmation of Summary Notice publication). To date, no objections to the maximum potential attorneys' fees request set forth in the Postcard Notice have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed by August 5, 2022.

### B. Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable

86. Lead Counsel seeks a total of $108,016.85 in Litigation Expenses to be paid from the Settlement Fund. This amount includes: $93,016.85 in out-of-pocket expenses reasonably and necessarily incurred by Plaintiffs' Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as a total of $15,000 ($3,000 each) to Messrs. DeMaggio, Prahl, Kinslow, Milo and Kee, pursuant to 15 U.S.C. § 78u-4(a)(4) for their reasonable costs

28

(including lost wages) directly incurred in connection with their representation of the Settlement Class.

87. Lead Counsel is seeking reimbursement of a total of $93,016.85 in out-of-pocket costs and expenses. The following is a combined breakdown by category of all expenses incurred by Plaintiffs' Counsel:

| ITEM | AMOUNT |
|---|---|
| COURIER | 180.53 |
| COURT FILING FEES | 800.00 |
| DOCUMENT MANAGEMENT | 3,350.00 |
| EXPERTS | 65,326.00 |
| INVESTIGATORS | 2,975.00 |
| MEDIATION | 7,900.00 |
| ONLINE RESEARCH | 7,157.82 |
| PHOTOIMAGING | 207.50 |
| PRESS RELEASES | 3,602.00 |
| SERVICE OF PROCESS | 388.75 |
| TRAVEL MEALS, HOTELS, TRANSPORTATION | 1,129.25 |
| GRAND TOTAL | 93,016.85 |

88. The Postcard Notice and long-form Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $135,000. The total amount requested by Lead Counsel and Plaintiffs, $108,016.85, falls well below the $135,000 that Settlement Class Members were advised could be sought. To date, no objections have been raised as to the maximum amount of expenses set forth in the Postcard Notice and Notice. If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in its reply papers.

89. From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover their out-of-pocket expenses. Plaintiffs' Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the

contemporaneous lost use of funds advanced to prosecute this Action. Accordingly, Plaintiffs' Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

90. The largest component of expenses, $65,326.00, or approximately 70.2% of the total expenses, was expended on the retention of experts—one in the field of accounting; and two in the field of damages and loss causation. These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint and a report on market efficiency in anticipation of Plaintiffs' motion for class certification, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

91. Additionally, Lead Counsel paid $7,900.00 in mediation fees owed to Ms. Yoshida for the services Ms. Yoshida provided during the settlement negotiation period, which is approximately 8.5% of the total expenses incurred.

92. The other litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These litigation expenses included, among other things, court fees, translation costs, service of process costs, cost of publishing press releases as required by the PSLRA, photoimaging, postage and delivery expenses, and the cost of on-line legal research.

93. Finally, as stated above, Plaintiffs seek reimbursement, pursuant to 15 U.S.C. § 78u-4(a)(4), of their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class, in the amount of $3,000 each. Plaintiffs worked closely with Lead Counsel throughout the pendency of this Action in connection with their service as Lead Plaintiffs. For example, Plaintiffs: (a) regularly communicated with Lead Counsel regarding the posture and progress of the case, as well as the litigation strategy; (b) reviewed all

significant pleadings and briefs filed in the Action; (c) reviewed Court orders and discussed them with Lead Counsel; (d) discussed mediation strategy with Lead Counsel; (e) evaluated the Settlement Amount, conferred with Lead Counsel, and ultimately approved the Settlement; and (e) communicated with Lead Counsel regarding finalizing the Settlement.

94. To date, no objections to the Litigation Expenses have been filed on the Court's docket. In my opinion, the Litigation Expenses incurred by Plaintiffs' Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII. CONCLUSION

95. In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable. I further submit that the requested fee in the amount of 33⅓% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of $108,016.85 in Litigation Expenses, including PSLRA reimbursement for costs in the amounts of $3,000 each for Plaintiffs DeMaggio, Prahl, Kinslow, Milo and Kee, should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 8th day of July, 2022, at Los Angeles, California.

*s/ Kara M. Wolke*
KARA M. WOLKE

31

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Declaration was served on all counsel of record

on July 8, 2022 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.


*/s/ Kara M. Wolke*
Kara M. Wolke